UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No. 06-CIV-20182-SEITZ**

**ALBERT HOLLAND,**
　　　　Petitioner,

vs.

**KENNETH S. TUCKER**,
Secretary, Florida Department of Corrections,

　　　　Respondent.
_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

**THIS CAUSE** came before the Court on Petitioner, Albert Holland's ("Mr. Holland")

Amended Petition for Writ of Habeas Corpus by a Person in State Custody, filed on April 4, 2011.

[D.E. 117]. Mr. Holland is currently on death row at the Union Correctional Institution in Raiford,

Florida following a conviction in 1996 for first degree murder.[1] The State and Mr. Holland have

filed a response, and reply, respectively. In total, Mr. Holland asserts eight claims with multiple

subclaims.

　　In this habeas corpus proceeding, brought pursuant to 28 U.S.C. §2254, Mr. Holland seeks

to overturn the death sentence imposed on him for his role in the first degree murder of Pompano

Beach police officer Scott Winters. Mr. Holland asserts eight separate and distinct constitutional

violations: (1) his right to self-representation was violated; (2) the trial court committed error by

_____

[1] Mr. Holland was also convicted of armed robbery, attempted sexual battery, and
attempted first-degree murder. *Holland v. State*, 773 So.2d 1065 (Fla. 2000).

1

admitting testimony from expert witnesses who relied on a report which had been ruled inadmissible by the Florida Supreme Court on direct appeal from Mr. Holland's first trial; (3) the Florida Supreme Court erroneously concluded that the admission of an inaudible videotape and improper opinion testimony was harmless error; (4) the trial court erred by denying Mr. Holland's motion to suppress; (5) the trial court erred in denying the motion for judgment of acquittal based on a lack of evidence of premeditation; (6) he was denied effective assistance of appellate counsel when counsel failed to challenge the trial court's exclusion of reference to internal affairs records and failed to raise denial of additional peremptory challenges; (7) he was denied effective assistance of trial counsel when counsel made an unreasonable concession of guilt during closing argument and failed to object to certain testimony and statements made by the prosecutor during closing argument; and (8) the trial court failed to consider non-statutory mitigation.

The Court has considered the written submissions, the entire record of Mr. Holland's state court proceedings, and applicable law. For the reasons that follow, the Petition for Writ of Habeas Corpus is **GRANTED**, in part, and **DENIED**, in part. The Court grants Mr. Holland habeas relief as to Claim One because the Florida Supreme Court made legal and factual determinations which involved an unreasonable application of clearly established federal law when it concluded that Mr. Holland's Sixth Amendment right to self-representation was not violated. However, Mr. Holland's remaining claims for habeas relief are denied because the Florida Supreme Court made legal and factual determinations which involved a reasonable application of clearly established federal law or a reasonable determination of the facts in light of the evidence presented.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background in this section is quoted from the opinion of the

2

Florida Supreme Court:

> Holland was convicted and sentenced to death for the 1990 murder of Pompano
> Beach police officer Scott Winters. On appeal, this Court reversed Holland's
> conviction due to the erroneous admission of expert medical testimony concerning
> an examination of Holland by a State psychiatrist. *See Holland v. State*, 636 So.2d
> 1289 (Fla.1994). The examination took place in violation of Holland's right to
> counsel and right to remain silent. *See id.* at 1292–93.

> The record from the retrial establishes the following facts. Holland attacked a woman
> he met on July 29, 1990. Holland ran off after a witness interrupted the attack. Police
> officers responding to a call about the attack found the woman semi-conscious with
> severe head wounds. Officer Winters and other officers began searching for the man
> believed to have been involved in the attack. A short time later, witnesses saw
> Officer Winters struggling with Holland. During the struggle, Holland grabbed
> Officer Winters' gun and shot him. Officer Winters died of gunshot wounds to the
> groin and lower stomach area.

*Holland v. State*, 773 So.2d 1065, 1068 (Fla. 2000). At the re-trial, Mr. Holland was again convicted

of first-degree murder. The jury recommended by an eight-to-four vote that Mr. Holland be

sentenced to death. The trial court found the following aggravating circumstances: (1) the defendant

was previously convicted of a felony involving the use or threat of violence to a person; (2) the

capital felony was committed while the defendant was engaged in the commission of, or in an

attempt to commit, or flight after committing or attempting to commit the crime of robbery or an

attempt to commit the crime of sexual battery or both; and (3)(a) the crime was committed for the

purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, merged with

(3)(b) the victim of the capital felony was a law enforcement officer engaged in the performance of

his legal duties. The court did not find that any statutory mitigating circumstances were established,

but did find the existence of two nonstatutory mitigating circumstances: (1) history of drug and

alcohol abuse (little weight) and (2) history of mental illness (little weight). The trial court

concluded that the aggravators outweighed the mitigators and sentenced Mr. Holland to death. *Id.*

at 1068.  On direct appeal, Mr. Holland raised twenty-two claims.[2]  The Florida Supreme Court

found Mr. Holland's claims without merit and affirmed his conviction and sentence of death.  *Id.*

Subsequently, Mr. Holland filed a Rule 3.851motion for postconviction relief.  The trial court

_____

[2] The Florida Supreme Court outlined Mr. Holland's claims as follows:

> (1) the trial court erred in denying Holland the opportunity to represent himself; (2) the trial court improperly instructed the jury on the intent element of felony murder and attempted sexual battery; (3) the trial court abused its discretion in denying Holland's motion to exclude the testimony of the State's mental health experts; (4) the trial court erred in failing to disqualify state attorney Michael Satz and the state attorney's office; (5) the trial court abused its discretion in denying Holland's motion to re-depose certain witnesses; (6) the trial court abused its discretion in overruling Holland's objections to the admissibility of a videotape; (7) the trial court abused its discretion in denying Holland's motion to suppress his statements to the police; (8) the trial court abused its discretion in allowing the admission of Dr. Tate's prior testimony; (9) the trial court abused its discretion in denying Holland's motion for judgment of acquittal; (10) the trial court abused its discretion in denying Holland's objections to Dr. Martell's testimony; (11) the trial court erred in rejecting as nonstatutory mitigation that Holland had two prior adjudications of insanity in Washington, D.C.; (12) the record does not support the trial court's findings regarding Dr. Polley and Dr. Patterson's testimony and the mental mitigators; (13) the trial court erred in rejecting the "extreme mental or emotional disturbance" mitigator; (14) the trial court failed to consider certain nonstatutory mitigators; (15) the trial court abused its discretion in admitting Roger Durban's testimony that related to one of Holland's prior offenses for which he was found not guilty by reason of insanity; (16) the trial court improperly doubled the "felony murder" and "prior violent felony" aggravators; (17) the trial court improperly instructed the jury on the "felony murder" aggravator and the record does not support this aggravator; (18) the trial court abused its discretion in admitting victim-impact evidence; (19) the trial court applied a presumption that death was the appropriate penalty when it found the existence of one aggravator; (20) the "felony murder" aggravator is unconstitutional; (21) the sentence of death is disproportionate; and (22) electrocution constitutes cruel and unusual punishment.

*Id.* at 1068.

4

conducted a limited evidentiary hearing on two claims pursuant to *Huff v. State*[3] and then issued an

order denying Mr. Holland relief on all claims.  Mr. Holland appealed to the Florida Supreme Court.

*Holland v. State*, 916 So.2d 750 (Fla. 2005).[4]  Mr. Holland also petitioned for state habeas relief.

*Id.*  Mr. Holland raised four claims of ineffective assistance of appellate counsel.  The Florida

Supreme Court affirmed the trial court's order denying Mr. Holland's motion for postconviction

---

[3] *Huff v. State*, 622 So.2d 982, 983 (Fla.1993) (requiring a hearing upon the filing of a postconviction motion and answer to determine whether an evidentiary hearing is needed and to hear argument on legal issues).

[4] On appeal, Mr. Holland raised the following eight claims:

> (1) that defense counsel was ineffective for failing to object to the testimony of the deputy who found the firearm the day after the incident that the firearm had been intentionally hidden; (2) that the State misstated the evidence, argued matters not in evidence, shifted the burden of proof, vouched for the credibility of State witnesses, expressed personal belief in Holland's guilt, ridiculed Holland and his defense, engaged in inflammatory argument, accused the defense of denigrating witnesses, and commented on Holland's postarrest silence, all without objection by defense counsel; (3) that Holland's guilt phase counsel was ineffective because he conceded Holland's guilt to attempted first-degree murder without his consent; (4) that the cumulative effect of defense counsel's failure to object to the various alleged procedural errors listed in claim II rendered Holland's trial fundamentally unfair; (5), (6), and (7) that Holland's death sentence is unconstitutional because a judge determined the aggravating circumstances instead of a jury in violation of the Sixth, Eighth, and Fourteenth Amendments, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (8) that Holland's penalty phase counsel was ineffective because he failed to properly investigate mitigation evidence concerning Holland's birth, childhood, and early adult life.

*Holland*, 773 So.2d at 1068.

relief and denied his petition for writ of habeas corpus. *Id.* at 762.

On January 19, 2006, Mr. Holland, acting *pro se* filed a petition pursuant to 28 U.S.C. §2254 for writ of habeas corpus by a person in state custody with the Court. (*See* [D.E. 1]). This Court dismissed the petition as barred by the statute of limitations. ([D.E. 46]). The Eleventh Circuit Court of Appeals affirmed. *Holland v. Florida*, 539 F.3d 1334 (11th Cir. 2008). Mr. Holland petitioned for a writ of certiorari to the United States Supreme Court which was granted and, after oral argument, reversed the Eleventh Circuit. *Holland v. Florida*, 130 S.Ct 2549 (2010).

On remand, the Court permitted Mr. Holland to amend his petition. ([D.E. 112]). On April 4, 2011, the instant petition was filed. ([D.E. 117]). On July 13, 2011, the State filed its response. (*See* [D.E. 120]). On October 3, 2011, Mr. Holland filed his reply. (*See* [D.E. 120]). This matter is now ripe.

## II. <u>STANDARD OF REVIEW</u>

Mr. Holland's habeas corpus petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified at various provisions in Title 28 of the U.S. Code), which significantly changed the standards of review that federal courts apply in habeas corpus proceedings. Under the AEDPA, if a claim was adjudicated on the merits in state court, habeas corpus relief can only be granted if the state court's adjudication results in one of two outcomes. It must have either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Mr. Holland's habeas petition is granted

pursuant to §2254(d)(1).

Pursuant to § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an] [opposite] result." *Williams v. Taylor,* 529 U.S. 362, 405 (2000). With respect to the "unreasonable application" prong of § 2254(d)(1), which applies when a state court identifies the correct legal principle but purportedly applies it incorrectly to the facts before it, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. *See also Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003). Significantly, an "objectively unreasonable application of federal law is different from an incorrect application of federal law." *Woodford v. Visciotti,* 537 U.S. 19, 24-25 (2002). In order to make this determination under § 2254(d)(1), "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United State Supreme] Court." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011).

### III.  CLAIMS ANALYSIS

In the instant petition, Mr. Holland asserts eight claims for federal habeas relief. Mr. Holland argues that his rights to self-representation and to remain silent were both violated. He contends that the Florida Supreme Court conducted a flawed harmless error analysis on direct appeal. Mr. Holland also asserts that there was insufficient evidence to support a finding of premeditation. He maintains that he received ineffective assistance of counsel at both trial and

on direct appeal.  Finally, Mr. Holland asserts that the trial court failed to consider non-statutory mitigation.  Because Mr. Holland's first claim is the sole claim warranting habeas relief, it is the principle focus of this opinion.  Mr. Holland has not met the deferential standard required for habeas relief on his remaining claims.

## I. SELF-REPRESENTATION

To begin, Mr. Holland's first claim for habeas relief is that the "trial court erred in denying the Petitioner his constitutional right to self-representation after he unequivocally requested to represent himself on several occasions." ([D.E. 117] at 8).  On at least ten separate occasions before trial, during trial, and in advance of the penalty phase, Mr. Holland requested to represent himself.  The trial judge determined that Mr. Holland could not represent himself because he did "not have any specific legal training" and was not "familiar with the rules of evidence, nor trial procedures, [and] is not familiar with how trial is conducted." ([D.E. 125-14] at 58).  This erroneous application of law resulted in Mr. Holland putting forth a defense of insanity which is not the defense that Mr. Holland wanted.  In his first trial, the defense was insanity.  Evidently, this defense was unsuccessful as it resulted in a guilty verdict.  At his re-trial, Mr. Holland made clear that if he were to represent himself, his intention would be to challenge the State's evidence or lack thereof.  When he was denied the right to represent himself, defense counsel proceeded again with an insanity defense.  This result violated the fundamental rights guaranteed to Mr. Holland by the Sixth Amendment to the United States Constitution. *See Faretta v. California*, 422 U.S. 806, 819 (1975)("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.").  This right was well understood and clearly

8

established law at the time of Mr. Holland's direct appeal to the Florida Supreme Court.

The United States Supreme Court expressly recognized the right to self representation in

1975. *Faretta v. California,* 422 U.S. 806 (1975). The Supreme Court held that the Sixth and

Fourteenth Amendments include a "constitutional right to proceed without counsel when" a

criminal defendant "voluntarily and intelligently elects to do so." 422 U.S. at 807. The *Faretta*

Court found that right existed based on:

> (1) a "nearly universal conviction," made manifest in state law, that "forcing a
> lawyer upon an unwilling defendant is contrary to his basic right to defend himself
> if he truly wants to do so," *id.*, at 817-818; (2) Sixth Amendment language
> granting rights to the "accused"; (3) Sixth Amendment structure indicating that
> the rights it sets forth, related to the "fair administration of American justice," are
> "persona[l]" to the accused, *id.*, at 818-821; (4) the absence of historical examples
> of forced representation, *id.*, at 821-832, 95 S.Ct. 2525; and (5) "respect for the
> individual," *id.*, at 834, 95 S.Ct. 2525 (quoting *Illinois v. Allen*, 397 U.S. 337,
> 350-351 (1970) (Brennan, J., concurring) (a knowing and intelligent waiver of
> counsel "must be honored out of 'that respect for the individual which is the
> lifeblood of the law'")).

*Indiana v. Edwards*, 554 U.S. 164, 170 (2008). Given this backdrop, the Court finds that the

Florida Supreme Court made an unreasonable application of clearly established federal law as

determined by the Supreme Court of the United States when it determined that Mr. Holland's

claim of error had no merit. §2254(d)(1).

## A. Facts and Procedural History

The factual underpinning's of this claim are unusual and highly unlikely to be repeated in

the future. The facts reflect a series of events which occurred as the result of not any one

singular error or misunderstanding and which resulted in a confluence of events that ultimately

caused the confusion between technical legal competence to represent oneself and the

competence required to make a knowing and voluntary waiver of that right. These facts are

essential to Mr. Holland's claim.  As such, they bear repeating.[5]

_____

[5] Mr. Holland's requests to represent himself appear to have been a by-product of a series of attempts to put forth a reasonable doubt/lack of evidence defense and the desire to have access to documents sought from his own counsel.  Mr. Holland is believed to suffer from some type of mental illness, perhaps a disorder involving paranoia or delusional thoughts. ([D.E. 125-11] at 88).  During Mr. Holland's first trial, the State of Florida violated his right to remain silent when it had an expert witness interview him in jail without notice to counsel in violation of the Fifth Amendment.  *See Holland*, 636 So.2d 1289 (Fla. 1994).  Sometime after his conviction and sentence was reversed, his trial counsel, Peter Giacoma, Esq. and the judge who presided over Mr. Holland's initial trial, the Honorable M. Daniel Futch became law partners. ([D.E. 125-3] at 61]).  His newly appointed counsel, Kenneth Delegal, Esq. was confined to a mental health facility during the course of his representation of Mr. Holland.  After Mr. Delegal's removal from the case, Mr. Holland would see Mr. Delegal periodically while Mr. Delegal was confined at the Broward County jail on drug and domestic violence charges. ([D.E. 125-14] at 37-38).  Ultimately, Mr. Delegal died of a drug overdose during the course of Mr. Holland's re-trial. ([D.E. 125-16] at 34).

Mr. Holland's second court-appointed counsel, James Lewis, Esq. shared office space with Mr. Delegal.  Mr. Lewis testified on behalf of Mr. Delegal (before his death) during a hearing a motion for attorney's fees as to Mr. Delegal's representation of Mr. Holland while Mr. Holland's re-trial was on-going. ([D.E. 125-15] at 3,100]).  Mr. Lewis was also quoted as responding "Yeah, I heard some rumors, but I chose not to know" when a reporter from the Sun-Sentinel asked him about Mr. Delegal's legal troubles after Mr. Delegal died from a drug overdose.  *See http://articles.sun-sentinel.com/1996-08-11/news/9608100307_1_grand-jury-charges-drug.*  Finally, during the course of Mr. Holland's trial, a film aired regarding the alleged wrongful convictions of two death row inmates from Broward County, Florida who were prosecuted by the same prosecutor, Michael Satz, Esq. who represented the State against Mr. Holland.  *See http://www.imdb.com/title/tt0116622/*  Those inmates were also sentenced by Judge Futch, the same judge who had presided over Mr. Holland's first trial.  Mr. Holland referred to this film on multiple occasions while arguing a conspiracy by the State, the trial judge, and defense counsel. ([D.E. 125-16]).

The Court does not express any opinion on the veracity of any of these stories but references them solely by way of background.  This is not a comment on the trial court or any of the trial attorneys.  The Court's sole concern here is the Florida Supreme Court's determinations pursuant to §2254.  While not relevant to the Court's review, it does assist in understanding why someone, perhaps predisposed to paranoia due to a mental disturbance, may have wanted self-representation over court-appointed counsel.

*Appointment of Counsel*

On August 12, 1991, Mr. Holland was convicted and sentenced to death.  The trial judge was the Honorable M. Daniel Futch.  At trial, Mr. Holland was represented by court appointed counsel, Peter Giacoma, Esq. and Young Tindall, Esq.  On direct appeal, the Florida Supreme Court reversed Mr. Holland's conviction and sentence and remanded the case for a new trial. *Holland v. State*, 636 So.2d 1289 (Fla. 1994).

On remand, Mr. Holland's case was assigned to a different judge, the Honorable Charles M. Greene.  The trial court held a hearing to appoint counsel.  Judge Greene knew of the partnership between Mr. Giacoma and Judge Futch and found that in order to avoid "any appearance of impropriety or any interest, whatsoever" the trial court would appoint new counsel. ([D.E. 125-3] at 61).

### i. Kenneth Delegal, Esq.

On August 24, 1994, the trial court held another hearing wherein Judge Greene appointed Kenneth Delegal, Esq. ([D.E. 125-3] at 76).  After the court announced the appointment of Mr. Delegal, the State announced that Mr. Holland should be informed that Mr. Delegal's brother had been an assistant state attorney for many years before going into private practice as a criminal defense attorney. (*Id.* at 78).  Mr. Delegal stated for the record that he was not associated with his brother but his brother did rent office space from him at one time.  Mr. Holland voiced some concerns about Mr. Delegal's representation of him and asked the court for some time to think about it.  Mr. Holland asked the court "if I say it makes me uncomfortable, you know, then what other choices do I have?" (*Id.* at 83).  The court did not respond to Mr. Holland's question and announced that Mr. Delegal was appointed.  (*Id.* at 84).

11

After the appointment of Mr. Delegal, Mr. Holland's case largely proceeded without issue for almost a year.  From time to time, Mr. Holland voiced concerns about not wanting to waive his speedy trial right but he felt he "did not have a choice" because he had been appointed counsel over his objection.  Mr. Holland also requested copies of the trial transcripts, depositions taken in the case, and police reports to be accessed at the Broward County Jail during the preparation of his trial.  Mr. Holland wanted to assist in his own defense.  Judge Greene agreed and entered an order requiring the Broward County Jail to "allow the defendant to review transcripts of his first trial and to store these transcripts in the jail as BSO deems appropriate." ([D.E. 125-78).  Mr. Delegal was to have these documents copied and delivered to Mr. Holland. For reasons explained below, these documents were never produced to Mr. Holland by Mr. Delegal.

In general, Mr. Holland remained cooperative and was not overtly disruptive in court.  On July 26, 1995, the court held a status conference where it was announced that Mr. Delegal will no longer be able to represent Mr. Holland due to Mr. Delegal's being confined to a mental health facility pursuant to the Baker Act.[6]  As of that date, Mr. Delegal had requested to be placed on inactive status with the Florida Supreme Court and The Florida Bar.  Appearing before the court was James Lewis, Esq. who shared office space with Mr. Delegal and was aware of the situation regarding Mr. Delegal's incapacity.  Mr. Lewis offered to appear as counsel for Mr. Holland during the re-trial.  Mr. Holland said he would like to think about it because he may want someone else appointed.  ([D.E. 125-9] at 20).  Nonetheless, the trial court appointed Mr. Lewis.

--------

[6] The Baker Act, also known as the Florida Mental Health Act, provides in part that "a law enforcement officer shall take a person who appears to meet the criteria for involuntary examination into custody." § 394.463(2)(a)(2), Fla. Stat. (1995).

Mr. Holland also voiced concerns about his current access to the jail law library (or lack thereof) and the fact that Mr. Delegal allowed an expert witness to interview him without videotaping the session. (*Id.* at 24). Mr. Holland suggested that perhaps the failure to videotape the session was due to Mr. Delegal being under the influence.

### ii. James Lewis, Esq. and Evan Baron, Esq.

On September 25, 1995, Mr. Holland addressed the court after he had refused to meet with counsel at the jail. Mr. Holland had written the trial court several letters requesting five things. First, he wanted the judge to recuse himself. Mr. Holland argued that he only consented to Judge Greene retaining jurisdiction over the case when the judge left the criminal division to preside in family court because Mr. Delegal advised this was best. However, now that Mr. Delegal was no longer on the case and his judgment was in serious doubt, Mr. Holland wanted to change positions. ([D.E. 125-9] at 85). Second, Mr. Holland also advised the court that he had not received copies of depositions as previously ordered by the trial court and was concerned that he would not get a fair trial based on Mr. Delegal's actions or lack thereof. Third, Mr. Holland asked for Mr. Lewis to be replaced. ([D.E. 125-10] at 25). Fourth, Mr. Holland also asked for Mr. Baron (penalty phase counsel) to be replaced since he was appointed along with Mr. Delegal. The trial court denied these requests but did require Mr. Lewis to provide Mr. Holland with the documents, trial transcripts and deposition transcripts that Mr. Delegal had been ordered to provide. In addition, Mr. Holland also argued to the trial court that an error may have been made in the indictment because according to his legal research attempted felony murder is not a crime

13

in Florida.[7]  (*Id.* ).

### *Competency*

On October 9, 1995, after Mr. Lewis reported some competency concerns about Mr.

Holland, the trial court appointed three independent mental health professionals to examine Mr.

Holland to make a determination if he was competent to stand trial.  Drs. Lee Bukstel, Trudy

Block-Garfield and Patsy Ceros-Livingston each evaluated Mr. Holland.  On December 14, 1995,

a competency hearing was held.  Each witness submitted an expert report on their findings and

those reports were admitted into evidence at the competency hearing.[8]  The record is unclear as to

when but Mr. Holland had been prescribed Haldol[9] at the time of the interviews.  On some

---

[7] While not directly relevant to Mr. Holland's current claim, it is noteworthy, that in 1995, this statement had a factual basis. *See State v. Gringe*, 656 So.2d 457 (Fla. 1995)("In sum, the State of Florida no longer recognizes the crime of attempted felony murder. This finding is applicable to all cases pending on direct review or not yet final at the time of the *Gray* opinion.").

[8] The Court has not reviewed the expert reports because those reports were "transferred to the custody of the capital collateral post conviction records repository" pursuant to Fla. Stat. §394.4615 and are not in the record before the Court.  ([D.E. 125-95] at 94).  However, the Court has reviewed all three expert's sworn testimony and can adjudicate this claim without reviewing the actual reports.

[9] Haloperidol (the generic equivalent of Haldol) is used to treat psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real). Haloperidol is also used to control motor tics (uncontrollable need to repeat certain body movements) and verbal tics (uncontrollable need to repeat sounds or words) in adults and children who have Tourette's disorder (condition characterized by motor or verbal tics). Haloperidol is also used to treat severe behavioral problems such as explosive, aggressive behavior or hyperactivity in children who cannot be treated with psychotherapy or with other medications. Haloperidol is in a group of medications called conventional antipsychotics. It works by decreasing abnormal excitement in the brain. *http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000604/*.

occasions, he had refused to take it. ([D.E. 125-11] at 53).  On other occasions, it appears that he

did take it. ([D.E. 125-11] at 110).  Regardless, all three doctors found Mr. Holland competent

(Dr. Ceros-Livingston did not determine that Mr. Holland was competent because she believes

that finding to be for the "trier of fact" but she did find that Mr. Holland met all the criteria for

competency (i.e.: he could assist counsel, knew the nature of the charges, possible sentence, so

on) to stand trial. ([D.E. 125-11] at 33-161).  All three experts concluded that Mr. Holland would

be able to conduct himself appropriately in court.  All three experts said Mr. Holland cooperated,

had behaved appropriately and understood the legal proceedings.  Indeed, Dr. Bukstel testified

that "I would say that as far as his awareness of the legal aspects of his case, more generally and

specifically that he probably gave, among the individuals that I interviewed, he probably gave

among the more sophisticated answers that I have received from people.  In other words, he's

very astute and has a very clear and intellectual understanding of the legal process as it relates to

his involvement in it." (*Id.* at 60).  Further, all three experts said that his prior hospitalization and

probable brain injury from a beating in jail many years ago did not affect his competency.  After

argument, the trial court found:

> Mr. Holland has voiced concerns and issues in a most eloquent manner to this
> Court and testimony reveals that Mr. Holland has average or above-average
> intelligence and he is able to function properly and appropriately. His thought
> process is intact. He can answer questions put to him and respond appropriately.
> The Court considers these six factors as well as the observations of this Court of
> Mr. Holland through the period of time this Court has presided over these
> proceeding [sic] and finds that Mr. Holland is at this time competent to proceed
> and to and [sic] stand trial.

(*Id.* at 143).

Thereafter, from December 14, 1995, to March 22, 1996, the record reflects that only

15

three hearings were held.  The record shows that Mr. Holland was present but did not speak or make any statements during these hearings.  There is nothing in the record to suggest that Mr. Holland disrupted the proceedings.  It was not until March 22, 1996, that Mr. Holland first raised the idea of self-representation.

On March 22, 1996, court began with the argument of several defense motions. ([D.E. 125-14] at 35).  Among other things, Mr. Lewis advised the court that Mr. Holland refused to see him at the jail and that Mr. Holland would like to address the court.  Mr. Holland first argued that Mr. Lewis was incompetent. He notified the court that he had still not seen depositions which had been court ordered when Mr. Delegal was Mr. Holland's counsel.  Mr. Holland also requested crime scene and autopsy photos (Mr. Holland believed these items were vital to his defense because of where the bullet wounds were and the fact that the deputy was wearing a bullet proof vest.). ([D.E. 125-14] at 50).  Mr. Holland's primary complaint was that he had not been given the documents that he had requested multiple times, including crime scene photos, autopsy photos, and trial transcripts.  Mr. Holland advised the trial court that his and Mr. Lewis' "client/lawyer relationship has deteriorated." (*Id.* at 45).  Mr. Lewis advised the trial court that Mr. Holland did, in fact, want copies of the autopsy photos but he would not give them to Mr. Holland because he "didn't think it proper or necessary." (*Id.* at 46).  Also, Mr. Lewis had not provided Mr. Holland with all the transcripts but did provide him with the ones he thought "necessary and important for him to have." (*Id.*).  The trial court stated that "[t]he Court candidly has heard Mr. Holland in a very coherent and organized manner express his thoughts --." (*Id.* at 48).  Mr. Holland interjected and continued to request new counsel until he finally asked "[o]ne last thing, and if I am allowed to represent myself will I be entitled to those things and present

those things, and have those things in my possession?" (*Id.* at 53).

At that point, the court addressed Mr. Holland:

THE COURT: Mr. Holland the Court will be happy to conduct a Ferretta [sic] inquiry to make a determination whether or not you're able to represent yourself, but I don't think you have had any training in the law.

Yes; you have sat through your prior trial. You've been involved in a capital litigation. You haven't demonstrated - - This is the first time that you're coming to the Court and even making a suggestion of representing yourself.

THE DEFENDANT: I asked the question would I be entitled to have photographs and be entitled to have photographs and be able to even view the victims and to present them and everything I want to know.

THE COURT: Mr. Holland, just the mere question that you're asking the Court is a procedural question. It's one that is governed by the rules of evidence as well as the criminal rules of procedure.

THE DEFENDANT: I'd like to take procedure - -

THE COURT: And just not to have the answer to that question and have to ask the Court to answer it evinces to the Court as yet you don't have the requisite legal ability to represent yourself, so I don't think I need to go much further than this.

Mr. Holland's [sic] made complaints as to all counsel that have ever been appointed to represent him since his indictment in this case that pertains to his first trial, as well as counsel, since the mandate remanding the case for new trial. The Court finds both Mr. Lewis and Mr. Baron - -

THE DEFENDANT: Your honor - -

THE COURT: Mr. Holland, I'm going to be making a statement now.
- - are competent, as well as effective counsel are under their oath as attorneys and the Court is confident to provide Mr. Holland with 100 percent of their loyalty.

THE DEFENDANT: Aren't you going to inquire, you Honor, and ask them some questions about what I just said, because I told you I was going to ask those and then let him respond and I had some other things.

THE COURT: Accordingly, Mr. Holland's ore tenus motion to disqualify his counsel, as well as his ore tenus motion to recuse the Court are denied. The Court

enters its' written order at this time.

Let us talk about scheduling, counsel. I know you have a problem with Doctor Buckstell and completing Doctor Buckstell's evaluation. I don't know if Mr. Holland is or is not going to voluntary participate in that process.

The only comment that the Court can make, if Mr. Holland evinces today before the Court *as he has throughout the pendency of these proceedings that I've sat on, a behavior and mental ability which is consistent with the findings that each of the experts whose testified before this Court that Mr. Holland is competent.*

***

(*Id.* at 54)(emphasis added). The court was about to conclude the hearing when Mr. Holland

inquired as follows:

THE DEFENDANT: I just want to say something else. Can we go through this procedure of self-representation?

I think it is very important right now, because you stated there is a way to do it.

THE COURT: The Court will at this juncture conduct a Ferretta [sic] inquiry. Mr. Holland, if you'd be good enough to tell the Court of your educational experience.

THE DEFENDANT: Well, I have a GED, but what I'm asking you, your honor –

THE COURT: I need to ask you certain questions in order to be able to make this decision.

THE DEFENDANT: Okay.

THE COURT: Okay.

THE DEFENDANT: I have a GED.

THE COURT: Tell the Court what legal training you have or what training you have that would assist you in being able to represent yourself charged with a capital crime as well as other crimes.

THE DEFENDANT: Would you repeat the question, please?

THE COURT: Tell me in simple terms what legal or other training you have that would assist you to represent yourself in proceedings of this nature.

THE DEFENDANT: Well, from what I have seen in the evidence, Ray Charles could come in here and represent himself and Stevie Wonder, so I don't need much legal training to do all that.

I mean anybody can see it. That it doesn't make sense what Mr. Satz and his people are saying. His people is saying and what my people is saying right along with them. You know, it doesn't take much to see it and a jury could see it.

THE COURT: Let's talk about your ability, for example, to select a jury to make proper legal objections, because the start of the trial - -

THE DEFENDANT: Well, I think I can do it. I can do better that what they were doing in here today in trying to do the questionnaire. I could do that.

THE COURT: Do you have any idea how to examine witnesses?

THE DEFENDANT: Well, I won't be disrespectful, your Honor. I'll ask them the questions, try to ask them as properly as I can.

THE COURT: How about to make legal objections?

THE DEFENDANT: Well, that may be kind of difficult if the judge doesn't allow you to do, like you're going to do to me sometimes but they - - I can make the objection properly.

THE COURT: Any training you've had, any books you've read?

THE DEFENDANT: No.

THE COURT: Any anything?

THE DEFENDANT: No, but what I am trying to tell you is, you know, I won't violate any rules here.  I won't be disruptive.

THE COURT: Do you know the rules that you could violate?

THE DEFENDANT: No, but I'm just saying common things that - don't interrupt people, something like that.

THE COURT: I don't think the Court needs to go much further in its' effort to conduct a Ferretta [sic] inquiry.

*The Court clearly finds Mr. Holland does not have any specific legal training, is*

> *not familiar with the rules of evidence, nor trial procedures, is not familiar with
> how a trial is conducted, even though he's sat through them in the past.*
>
> THE DEFENDANT: If you could give me a pamphlet or something to study,
> maybe I could have [sic] be ready by then.
>
> THE COURT: Mr. Holland, people go to law school for years and then spend
> additional years being able to acquire such knowledge.
>
> THE DEFENDANT: Suppose I don't want to question any witnesses?
>
> THE COURT: Mr. Holland, you would be by blanketly [sic] making the statement
> that you're going to allow the State just to present witnesses and you're not going
> to ask anything?
>
> THE DEFENDANT: Why do I have to have legal training to represent myself?
> That's what I want to know.
>
> THE COURT: I can't argue with you, Mr. Holland. I don't intend to. I'm going to
> deny - -
>
> THE DEFENDANT: Because if I get up in front of the jury - -
>
> THE COURT: I'm going to deny your request pursuant to Ferretta [sic] to
> represent yourself.

*Id.* at 55-58. (emphasis added).  Thereafter, the court issued a written order which stated

"[d]efendant's motion to represent himself is denied after court having conducted a Farretta [sic]

hearing, finding that the Defendant is *incapable* to represent himself." ([D.E. 125-78] at

88)(emphasis added).

The case proceeded with Mr. Holland being represented by Mr. Lewis and Mr. Baron.

From time to time, Mr. Holland voiced complaints regarding his counsel and access to

documents.[10]  However, on August 2, 1996, defense counsel filed a motion for Mr. Holland to be

---

[10] Mr. Holland was also the subject of an emergency motion by the State for refusing to
continue an interview with the State's mental health expert on June 28, 1996.  Mr. Holland had
initially been cooperative with the doctor until he told the doctor that he thought his lawyers and

given an MRI.  During the hearing, Mr. Holland again requests that his attorneys be removed and

that he be given new attorneys.[11] The court summarily denied the request.  The court granted the

motion for a MRI.  Then, Mr. Holland again raised the issue of the deposition transcripts. He had

received some but not all.  He also advised that he did not have a complete witness list and he

requested one from counsel.  Mr. Holland then continued to voice his concerns to the trial court

at which point the court interrupted and said:

> THE COURT:  Mr. Holland, understand something, and I think we're really
> getting to the point where this needs to be made, a statement needs to be made.
> You have been appointed two very fine capable counsel, they are representing
> you, Mr. Holland. You've already indicated that you do not have the wherewithal
> in your education your experience with the - -.
>
> THE DEFENDANT: I never told you that.
>
> THE COURT: - - to represent yourself?
>
> THE DEFENDANT: I never told you that.
>
> THE COURT: And the Court has already been through this.
>
> Mr. Holland, candidly, your attorneys are representing you.  The Court has given
> you all of the opportunity to have review [sic] your deposition. And Mr. Lewis is
> working into getting those depositions through Broward jail. And candidly, they
> are representing you for trial.

———————————————

the State were suppressing evidence because his lawyers still had not given him the documents as
ordered by the court.  The State's doctor told Mr. Holland that they weren't suppressed because
he had, in fact, seen those very documents.  Mr. Holland then terminated the interview because
he believed that the State's expert had been privy to information that he was not given by his own
lawyers despite a court order directing them to do so. ([D.E. 125-14] at 112-35).

   [11] In the interim period between March 22, 1996 and August 2, 1996, Mr. Holland had
also attended a hearing on Mr. Delegal's (Mr. Holland's former counsel) motion for attorney's
fees. Mr. Lewis (Mr. Holland's then current attorney) testified in support of Mr. Delegal's fee
petition. (*See* [D.E. 125-15 at 3]).  Mr. Holland was present at this hearing and voiced an
objection to Mr. Lewis' testimony.

THE DEFENDANT: I have one thing to say, and I'll let you go - - really two.

On pro se, to proceed on my own. I want to know if I would have enough time and everything to study my case.

Number two is when Mr. Lewis testified for Mr. Delegal for his motion. And I have something I want to tell you, how I asked them to ask for your recusal.  And I have many grounds why you should be reaccused [sic].

When he testified at Mr. Delegal's motion for compensation, he said he received $34,000, by the way. I don't know if that is true or not, I'm just going by what I know.

But when he testified at that hearing - let me tell you what it is now, he abandoned his duty and loyalty to me, because a lawyer should not represent a client if the lawyer's exercise of independent judgment in the representation of that client may be material [sic] by a lawyer's responsibility to another client or third person or by that lawyer's own interest.

And he rents office space from Mr. Delegal and Mr. Delegal is a long time friend. He didn't care anything about me. He now has denied me effective assistance of counsel because his loyalty was impaired because he couldn't consider, recommend, or carry out any appropriate cause of action for me, because – I have some grounds or appeal that I was going to argue that Mr. Delegal was ineffective in different issues.

Now he does nothing but voucher - to vouch for Mr. Delegal when he testified for him, to show everything was in order and he did a good job on this.

How could have [sic] done a good job, but when he was stalking his wife and getting alcohol and drugs and arrested all of them times and everything – I'm saying there is a conflict of interest.

Who knows what he's been doing behind my back. You see what I'm saying, there is a conflict of interest where he's - -

THE COURT: Mr. Holland, obviously, I did not preside over the fees hearing.

THE DEFENDANT: I tried to bring it up in front of Judge Cohn, C-O-H-N and he didn't want to hear it.

But what I want to ask you: Why do you think that I said I couldn't handle my Defense, you think I am not qualified?

22

THE COURT: Mr. Holland, Mr. Lewis did you just testify as to reviewing the file as to Mr. Delegal's work?

MR. LEWIS: Yes, Judge. At the [sic] Judge Cohn's request I appeared at the hearing and testified as to the work that had been done on the case prior to my taking it over.

THE COURT: Then the ore tenus motion to disqualify Mr. Lewis based upon his testifying Judge Cohn's request is denied as to Mr. Holland's request to represent himself. The Court is going to conduct a Faretta inquiry at this time.

Mr. Holland, do you want to raise your right hand.

* * *

THE COURT: Okay.

Sir, why don't you tell us you're education, how far you went in school.

THE DEFENDANT: I have a GED.

THE COURT: When did you acquire that GED?

THE DEFENDANT: You said when or where?

THE COURT: When. When.

THE DEFENDANT: It was when I was in prison, I believe it was1980.

THE COURT: Since you've obtained your GED, have you obtained any other educational training, experience.

THE DEFENDANT: Well, no, I haven't.

THE COURT: Okay. Tell me specifically what legal training you have?

THE DEFENDANT: Well since I have been getting arrested, I know a little things here and there about the law. I've been reading cases now since this time. I've been studying a little bit on the law and I've become familarized a little bit where I think I can handle my case.

I know my main thing is to able to organize and argue the way I want to argue and question witnesses, subpoena and to look at all discovery that's - -

THE COURT: Tell me what you know about the rules of procedure.

THE DEFENDANT: Ah - see, what I'm trying to point out to you, Judge, Your Honor - -

THE COURT: Please respond to the Court's question, Mr. Holland.

THE DEFENDANT: I will. I know that if I'm going to participate in a trial, I can have Voir Dire and ask witnesses, I mean, jurors certain questions. I can pick my own jury.

I would object when the Prosecutor, Mr. Michael Satz, is out of line and when it's time for me to object.

THE COURT: How would you know when it's time to object?

THE DEFENDANT: (Defendant shakes his head)

THE COURT: You're nodding your head to the negative; you wouldn't know, would you?

THE DEFENDANT: I don't - -I was being nodding my head in the negative.  I would know to do it because I know when it's not appropriate.

THE COURT: Do you know that because of case law or because of the rules of procedure?

THE DEFENDANT: I know it because - - if you let me, may I give you an example?

THE COURT: Sure.

THE DEFENDANT: He may be questioning the witness in a bad way, and I can say he's badgering the witness.

THE COURT: Okay. Now you are talking about witness instead of selecting a jury.

THE DEFENDANT: What was your question again?

THE COURT: How would you know when to object, how would you know the legal grounds or case law to support your objection?

24

THE DEFENDANT: Say it again.

THE COURT: Okay.  I said it as many times as I am going to. Any questions, Mr. Lewis that you have?

THE DEFENDANT: What I was going to tell you - -

THE COURT: Any questions you have?

MR. SATZ: No, Your Honor.

THE DEFENDANT: I was going to tell you this, you can give me standby counsel.

And to answer your question, like on Matlock.

THE COURT: A TV show?

THE DEFENDANT: They say, speculation.

THE COURT: Matlock TV show?

THE DEFENDANT: I'm using it as an example to answer your question.

I was saying that is speculation or no foundation. But I know what I would object to it and I wouldn't be out of order or disruptive in any kind of way.

THE COURT: The Court having conducted a Faretta inquiry, the Court finds Mr. Holland is not able to *adequately appropriately represent himself.*

THE DEFENDANT: Or you can apply me - -

THE COURT: The Court's ruling at this juncture.

Nor comply with the Court's order, nor with the applicable rules of evidence, rules of criminal procedure, as well as case law.

THE DEFENDANT: One more thing.

THE COURT: Mr. Holland is in need of counsel both in - -

THE DEFENDANT: What about stand by counsel?

THE COURT: - - both in the proof phase or guilt phase of the case, as well as in a possible penalty phase. And as such, Mr. Holland's motion to represent himself is denied.

The Court's in recess.

THE DEFENDANT: Can I ask one more questions, then I'll leave it alone, Judge.

Your honor, please.

THE COURT: One more question, Mr. Holland?

THE DEFENDANT: Listen to me. I am not trying to cause you any problem. I'm trying to know this for myself.

When I'm dealing with Bukstel or Martell[12] why is it a feeling that I have that I'm being forced on here, and like I said the conflict of this and how - explain this to me, Your Honor.

How it's like I'm forced to do this and that when it's obvious that I'm being incompetently represented.

THE COURT: All right.

Mr. Holland I can't answer that question for you. And the Court will be in resist [sic] at this time.

(Thereupon, the hearing was concluded.)

([D.E. 125-15] at 99-108.)(emphasis added).

On August 26, 1996, defense counsel moved to withdraw. A hearing was held. Defense counsel advised the trial court that Mr. Holland believes "that he would be better off handling this on his own based on the representation that he has had in the past from Mr. Giacoma, Mr. Tindall, Mr. Delegal, myself and Mr. Lewis. His belief is he can do a better job." ([D.E. 125-16] at 8). Before Mr. Holland made any statements, the trial court made a record of prior *Faretta*

---

[12] A clinical psychologist who testified on behalf of the State of Florida.

inquiries to Mr. Holland.  In that regard, the court made the following findings of fact on the

record:

> Mr. Holland on numerous occasions has indicated that he would rather represent himself.  I believe it was on in July 25th this Court conducted a Faretta Inquiry.  And the Court has had previous dialogue with Mr. Holland regarding his abilities, one, to understand what is taking place and the seriousness of the charges.  And certainly, I believe Mr. Holland is aware that he faces the possibility of the imposition of the death penalty.
>
> The Court discussed with Mr. Holland the factors of his childhood, which the Court is aware from prior hearing, the facts from prior hearings.
>
> Mr. Holland has suffered an injury to the head and was hospitalized at Saint Elizabeth's in Washington D.C. while he was incarcerated approximately - correct me if I'm wrong - ten, twelve years ago, approximately; is that right?
>
> He has indicated that he has obtained a GED since he's been incarcerated. Mr. Holland has obviously sat through his prior first degree murder trial, but that is not exactly correct, because due to Mr. Holland's behavior Mr. Holland was removed from that courtroom and watched that proceeding on closed-circuit television.
>
> So Mr. Holland has previously demonstrated, before Judge Futch in his prior trial of this case, his inability to follow the Court's orders and decorum required to be in a courtroom.
>
> The Court discussed with Mr. Holland his knowledge of the law and his ability to make those objections which are necessary skills to present his own case.  And Mr. Holland to date, has [not] demonstrated his ability to the Court to do so.
>
> Mr. Holland is still, from my understanding by the pleadings that are in this case, relying on the defense of insanity.  I believe that touches upon his mental condition and ability to understand the nature as well as the complexity of this case.
>
> Now the Court having said that, the Court is going to combine a Faretta Inquiry as well as a Nelson Inquiry to Mr. Holland's reasons and desires to have both Mr. Baron as well as Mr. Lewis discharged as his Counsel.

([D.E. 125-16] at 13).  The trial court then allowed Mr. Holland to speak at great length

27

regarding why he wanted to discharge his counsel and represent himself.[13] The trial judge then

questioned Mr. Holland's attorneys regarding their qualifications, how long they had been

members of The Florida Bar, and, at Mr. Holland's initiation, the race and ethnicity of their

former clients. (*Id.* at 69-102). Specifically, the trial judge inquired as to the preparation needed

for the penalty phase of a capital trial. The trial court then determined that Mr. Holland's

attorneys were "prepared to effectively represent him at trial." (*Id.* at 102). The trial court then

chronicled Mr. Holland's complaints with his current and prior attorneys and also put into the

record that while he was not present at Mr. Holland's original trial that the court "did have the

opportunity to review the trial transcript - it is clear from the testimony presented that Mr.

Holland conducted himself in such a manner that it was necessary for him to be removed from

the courtroom during trial." (*Id.* at 103). As to Mr. Holland's current request to represent

himself,

> THE COURT: He says he wants to do anything he can in his defense. In order to
> do that, the best thing he can do is cooperate fully with his Counsel, who have
> been working hard and effectively in trying to present his defense.
>
> On April - I'm sorry on August 2nd the Court discussed a *Faretta* Inquiry and the
> Court made clear to Mr. Holland the issues as to his education and to his legal
> experiences and to his knowledge of both criminal law and his procedures.
>
> The one issue that is also glaring is Mr. Holland's ability to comply with the
> Court's orders, to properly and simply to do that which he's ordered as well as to
> comply with courtroom behavior. And at his last trial evidenced an inability to
> have done so.
>
> THE DEFENDANT: May I say something, You Honor?

---

[13]   The trial judge was exceedingly patient with Mr. Holland; giving him ample time to
air his grievances and make requests. The entire hearing encompasses 132 pages of transcript.
([D.E. 125-16]).

THE COURT: Yes, you may Mr. Holland.

THE DEFENDANT: Well since I've been back here, since I came back from death row, you haven't had any disturbances from me. I don't know why you would say that.

You're going by my last trial, but that's a whole different ball game.

You had any disturbances; if anything you've been disturbing by not giving me time to air myself and state to you, in an orderly fashion, why I feel my attorneys are incompetent.

THE COURT: Mr. Holland, I think the record will speak for itself.  And the Court's been very, very patient with you more so than, I think, you find most other judges any where - -

THE DEFENDANT: You said that.

THE COURT: - - give you the opportunity and time to speak to the Court in the passed [sic] as well as today.

Mr. Lewis, Mr. Barn [sic] based on your preparation of the case, it is still your defense to proceed with the defense of Insanity?

MR. LEWIS: Yes, Judge.

THE COURT: Based upon that and the prior inquiries as well today's inquiries, the Court's going to deny Mr. Holland the opportunity to represent himself.

The Court specifically finds that *both his lack of formal legal training, lack of understanding of both the criminal law as well as procedure, his alleged defense or defense actually, of insanity and the complexity of this case.*

(*Id.* at 105-06)(emphasis added).  The trial court's written order read as follows: "CT denies Mr.

Holland to represent himself. M/Withdraw denied. Nelson Inquiry Held and Continued Faretta

Hearing Conducted." ([D.E. 125-79] at 71).

Afterwards, Mr. Holland's case proceeded and he attended hearings with minimal or no

comment.  However, this changed on September 18, 1996, on the eve of trial.  Initially, Mr.

29

Holland asked the court to discharge his attorneys and he also requested a suit to wear for his

trial. ([D.E. 125-17] at 112).  The court denied his request as to counsel but granted his request

for a suit. (*See id.*).  Mr. Holland then advised the court that he cooperated with all the State's

expert witnesses and did the MRI examination.   Mr. Holland then again requested to represent

himself.

> THE DEFENDANT: If you don't discharge them, I would like to represent myself
> because I feel I can win my case, you know.  I can win it and I would like to
> represent myself.
>
> THE COURT: Mr. Holland, these are issues the Court previously addressed,
> previously ruled on. There is nothing new.
>
> THE DEFENDANT: I wasn't found competent then, I was found competent now,
> and I'm literate and I'm understanding and I would like to voluntarily do my own
> defense.
>
> THE COURT: This Court found you competent several months ago and entered
> it's order. The motion to discharge trial counsel is denied. Motion to represent
> yourself is denied.
>
> * * *
>
> THE DEFENDANT: Well, my attorneys haven't been to the crime scenes and
> they haven't told me why they feel like going to the crime scenes is not necessary.
>
> Also, they have suppressed evidence, I've shown them evidence that would prove
> my innocence and they are suppressing evidence.
>
> THE COURT: The Court's ruling remains.

([D.E. 125-17] at 115).  After hearing, the trial court entered an order that defendant's "renewed

motion to represent himself denied." ([D.E. 125-81] at 45).  In advance of trial, Mr. Holland had

made several timely requests to represent himself.  All of his requests were denied.  On

September 24, 1996, jury selection in Mr. Holland's re-trial began. The entire trial from jury

selection to the court's imposition of the death sentence spanned a five month period.[14]

### *Re-Trial*

On the first day of the re-trial, but before the voir dire of the jury, Mr. Holland again requested to represent himself.

> THE DEFENDANT: Well, as I have been telling you up until now, I would like you, for you to dismiss my attorneys because they are incompetent and I have more reasons if you would like to hear them also.
>
> Before, I had asked you if you don't discharge my attorneys, to let me represent myself, because I can win my case. But then you asked me about how I would handle my defense and I told you, well, you asked me how I would object and everything, and I gave you the best example at that moment, but I can better clarify that, because you may use that against me.
>
> I told you I would do it like on Matlock. I think I better clarify for you. I said on Matlock, when they object for speculation, or object for lack of foundation, but I will also object in other ways, also, for inadmissible evidence, and so forth.
>
> So, I would like you to let me represent myself, if you don't want to dismiss these incompetent attorneys. They are not trying to do anything for me.
>
> * * *
>
> THE COURT: Additionally, Mr. Holland, the Court's rulings previously entered, are the same rulings today.
>
> *You're being denied the opportunity to represent yourself. You have filed a defense of insanity. You have been appointed Mr. Lewis and Mr. Baron to represent you. They are two very capable counsel.*
>
> The Court has previously conducted numerous Ferretta [sic] inquiries and the Court denied you the opportunity to represent yourself.

([D.E. 125-18] at 8-11)(emphasis added).

---

[14] Jury selection took nine days; the guilt phase trial was fifteen days long; the penalty phase and sentencing took five days. Of course, there were additional hearings and charge conferences during trial which resulted in a total of 33 days of actual court time. *See* ([D.E. 125-(18-69]).

31

On October 1, 1996, during jury selection, Mr. Holland again requested that his attorneys be discharged and that he be allowed to represent himself. (*See* [D.E. 125-25] at 39). In desperation, Mr. Holland advised the trial court that it could "get rid of them now, you don't even have to give me time to prepare. I'll try to represent myself from right now. You let me do it, I'll do it right now." (*Id.* at 41). The court rejected this offer finding that "[y]ou're not, candidly, prepared or capable of representing yourself. You have two fine lawyers doing it for you, and that's the rule of the Court." (*Id.* at 41-42). Mr. Holland continued to object to being represented by Mr. Lewis and Mr. Baron. Mr. Holland also argued that even though his request to represent himself was denied, he would still like to participate in the jury selection process, as long as cooperating with his counsel would not negatively impact his appellate rights. (*Id.* at 44). The trial court continued to deny his requests. The trial court then asked the attorneys if there was anything further. The Assistant State Attorney made the following statement[15]:

> MS. MCCANN: Your Honor, just under the case law, you've inquired of Mr. Holland. I think it is appropriate *to inform him that he could be representing himself*, have a Faretta inquiry, you've already determined he's not competent to represent himself in these proceedings.
>
> THE COURT: The Court's made its determination pursuant to Faretta. The Court's [sic] had numerous inquiries and the Court is candidly satisfied that Mr. Lewis and Mr. Baron are effectively representing Mr. Holland.

([D.E. 125-25] at 53)(emphasis added). Thereafter, the court issued a written order which denied Mr. Holland's requests to discharge his counsel and also found that "[t]his court has previously conducted a Faretta inquiry and has found that the Defendant is incompetent to represent

---

[15] Ironically, this statement from the Assistant State Attorney was the first time during the two years of pre-trial proceedings that anyone attempted to directly inform or advise Mr. Holland of his Sixth Amendment right to self-representation.

himself." ([D.E. 125-81] at 78).

The following day, October 2, 1996, Mr. Holland advised the court that he was not satisfied with how his attorneys were handling jury selection. Mr. Holland had a specific question regarding his race as an African-American and the victim being a white police offer that he wanted presented to the jury. ([D.E. 125-27] at 8). Mr. Lewis advised the court that he had made a strategic decision to not ask that question. (*Id.* at 11-12). The court took a recess and allowed Mr. Holland to discuss this issue with counsel. After the break, Mr. Lewis advised the court:

> MR. LEWIS: Judge, while we were waiting for that juror. I can tell you that I spoke with Mr. Holland and asked him his advice on that issue about asking the additional question, would it make a difference, the fact that Mr. Holland is an African-American and one of the victims in the case is causation [sic] or white.
>
> He has requested that we reconvene the jury and that I ask that additional question.
>
> Again Judge, that goes against my better judgment. And I explained that to Mr. Holland.
>
> Quite frankly, unless the Court is going to order me to ask that question, I think it is so prejudicial to the case that I am not inclined to ask it. If you're telling me because it is Mr. Holland's wish that I ask that question, I will. But I'm strongly resisting it. I would ask the Court to order me to do it.
>
> THE COURT: Mr. Holland, did you hear what Mr. Lewis said?
>
> THE DEFENDANT: Yes, I did.
>
> THE COURT: Have you had time to think about this matter and time to discuss this with Mr. Lewis and Mr. Baron?
>
> THE DEFENDANT: What we said here.
>
> THE COURT: Do you understand they're recommending and their advice that this particular question not be asked of the jurors and they told you why, as they

have the Court.

THE DEFENDANT: I have a feeling inside me that that is a very important question to ask.

THE COURT: Mr. Holland, if you want the question asked I'm going to direct Mr. Lewis to ask it for you.

That's entirely up to you. You're on trial and if you feel the question is that important - and candidly, it's a discretionary call. And different attorneys may have different strategies or beliefs as to what is prejudicial or not to their client.

Mr. Lewis has given you the best advice as has Mr. Baron, if you want the question asked it will be asked.

([D.E. 125-27] at 15-16).  Thereafter, Mr. Holland's race-based question was asked to the venire

panel.

On October 3, 1996, the day after the jury had been selected, Mr. Holland again requested

to have his attorneys discharged and be able to represent himself.

THE DEFENDANT: I tell you what, Your Honor, let's do it like this - - I'm not going to cooperate with these attorneys. Okay. Just let me represent myself. These attorneys are incompetent.

It goes to show you right here you try to cover it up, you try to cover it up by trying to do all this about the tape and everything.

It's coming out that you're not going to finish with your game plan, whatever you're trying to do to cover it all up.

THE COURT: Have you had a chance - -

THE DEFENDANT: It's obvious I can represent myself, Your Honor, that's what I would like to do. I'm competent. I'm literate. I'm understanding. And I'm voluntarily exercising my informed free will. I can represent myself. I don't need these no good attorneys. They already railroaded me through the jury process, picking that old, stupid jury in the prosecution's favor.

([D.E. 125-30] at 87-88).  The trial court did not address Mr. Holland's request and recessed the

hearing.

The issue of self-representation presented itself again on the next day of trial.  During a hearing on the State's motions in limine, Mr. Holland again raised his attorney's incompetence and his desire to represent himself.  (*See* [D.E. 125-31] at 15-24).   Again, the Court did not address Mr. Holland's request. (*Id.*)

On October 8, 1996, the court held a hearing on the defense's motion in limine.  Before the hearing began, Mr. Holland addressed the court:

> THE DEFENDANT: Your Honor, can I say one thing? Yeah, I would like to discharge my attorneys because they are incompetent and if you don't want to discharge them, let me represent myself.
>
> THE COURT: Mr. Holland, even my patience at some point ends.
>
> THE DEFENDANT: The only reason that I - -
>
> THE COURT: I'm tired, candidly, Mr. Holland, every time we come in the door, hearing the exact same speech from you. I've heard it. It's on the record. Your motions are denied and that's it.
>
> THE DEFENDANT: Can I just say one thing, Your Honor?
>
> THE COURT: What?
>
> THE DEFENDANT: The only reason I cooperated with them, I didn't want to disobey your court order, but now I see that I don't think I should have cooperated with these attorneys and I'm sorry I did it. I would have preferred to represent myself.
>
> THE COURT: Mr. Holland, if you decide to cooperate with your attorneys or you decide not to is your decision. The Court's already addressed the matters fully and completely and you do whatever you feel you want to do and that which is in your best interest.
>
> The attorneys have been appointed to represent you. They are extremely capable, competent counsel and they will continue to represent you.

> *Mr. Holland, you do not have the first idea, candidly, of how to properly represent yourself and that's it.*
>
> THE DEFENDANT: I can do better than what they are doing. I don't think because I don't have the legal experience to do it, I should be able to decide if I want to represent myself. If a person can't represent themselves, I don't see why we have a court of law.
>
> He who represents himself has a fool for a client, and I'm a fool. I want to represent myself.
>
> THE COURT: The stakes are too great for you to represent yourself. The Court denies your motion.

([D.E. 125-31] at 82-85)(emphasis added).

Mr. Holland's defense presented his case the following day. Over his continued objection, Mr. Holland was represented by Mr. Lewis and Mr. Baron during the remainder of his re-trial.

On October 24, 1996, outside the presence of the jury, Mr. Lewis advised the court that the defendant was not going to testify and the defense was planning to rest the following day. (*See* [D.E. 125-45). However, the next morning, Mr. Holland advised the court that he had "done some thinking" and he would like to testify in his own defense after all. ([D.E. 125-46] at 116-17). After a significant amount of indecision, Mr. Holland ultimately decided to testify. Mr. Holland indicated that he must do so because the trial court "forced upon me, these no good attorneys." ([D.E. 125-48] at 19). The trial court advised Mr. Holland multiple times regarding his rights to either testify or not testify. (*Id.*). The trial court asked questions in order to determine if Mr. Holland was making a knowing and voluntary waiver of his rights. (*Id.*). Then, the trial court found that his waiver was knowing and voluntary. On October 28, 1996, Mr. Holland took the stand in his own defense. (*See* [D.E. 125-48]). Mr. Holland testified to

questions posed to him by his counsel on direct examination rather than testify in the narrative. (*Id.*).  Mr. Holland's testimony spanned a period of days. (*Id.*).

Thereafter, the trial court allowed Mr. Holland to actively participate in the charge conference and jury instructions. (*See* [D.E. 125-59).  At one point during a disagreement between Mr. Holland and his counsel regarding a lesser included offense in the jury instructions, the court allowed Mr. Holland to make a waiver.

> THE COURT: Do you understand that if you were to be found guilty of any of these lesser included offenses, that you're asking for, that the Court's telling you are not charged by indictment, that you waive for now and in the future any claim that you could not be found guilty of those lesser included offenses; do you understand that?
>
> THE DEFENDANT: I understand that, but like the one yesterday of the lesser felony murder, if my attorneys would have gotten up there - -
>
> THE COURT: I'm trying to stay focused on one thing. I know it's your intention and desire that you'd like to move on one thing to another. I like to stay on one thing.
>
> THE DEFENDANT: I told you over and over I understand.
>
> THE COURT: Well the Court finds *the waiver to be knowingly and intelligently.*

([D.E. 125-62] at 33)(emphasis added).  On November 6, 1996, the jury found Mr. Holland guilty of first-degree murder, robbery, attempt to commit sexual battery upon a person twelve years of age or older with great force, and attempted first degree murder with a weapon.  ([D.E. 125-64] at 132-33).

Following the verdict and in advance of the penalty phase, Mr. Holland again requested that his attorneys be discharged.  (*See* [D.E. 125-64] at 138).  His request was denied. (*Id.*)  After his final request was denied, Mr. Holland no longer spoke with his counsel or the trial court;

rather he sat and read a book (the court presumed it was the Bible) during all court proceedings outside the presence of the jury. ([D.E. 125-64] at 14). When the jury was present, Mr. Holland was attentive. Mr. Holland did not testify at the penalty phase. ([D.E. 125-69] at 21). On November 15, 1996, the jury recommended by a vote of eight to four that Mr. Holland be sentenced to death. ([D.E. 125-70] at 99-100). Mr. Holland continued to remain silent and did not converse with his counsel or the court for the remainder of all penalty proceedings. The court found that "Mr. Holland's lack of desire to participate in a *Spencer*[16] hearing is freely and voluntarily done by Mr. Holland." ([D.E. 125-71] at 15)(emphasis added).

After the trial court conducted the *Spencer* hearing, the judge adopted the jury's majority recommendation and sentenced Mr. Holland to death. In the sentencing order, the trial court found that "[p]rior to his convictions on November 6, 1996, Albert Holland, Jr. frequently addressed the Court, participated in tactical decisions with counsel and testified before the jury at great length." ([D.E. 125-83] at 71). Further, in mitigation, the court gave "little weight" to the fact that Mr. Holland suffered from a long standing history of mental illness. ([D.E. 125-84] at 18). In fact, the trial court specifically found:

> [t]he defendant *correctly argued caselaw and factual issues to the Court*. He assisted his attorneys as he determined it was to his advantage in the preparation of his defense. He testified at great length to the jury during the guilt phase of the trial. The defendant's active participation during his trial and volitional decision at times not respond to the Court outside the presence of the jury, clearly establish his ability to participate, manipulate and engineer his actions.

(*Id.* at 18-19)(emphasis added).

Additionally, the defense asked the court to consider Mr. Holland's "two prior

---

[16] In Florida, the parties can present additional evidence before the sentencing judge that the sentencing jury never heard. *See Spencer v. State*, 615 So.2d 688, 691 (Fla. 1993).

adjudications of insanity, in the Superior Court of the District of Columbia" as a non-statutory mitigator. ([D.E. 125-84] at 19).  Although the judge took into consideration Mr. Holland's insanity defense during the *Faretta* hearings, when asked to consider his prior adjudications of insanity in mitigation, the trial court denied this request.

> The Defendant's two prior adjudications of insanity were not based upon the law as it exists in the State of Florida.  Pursuant to the test for insanity in the District of Columbia, the defendant was found to be insane because he committed the crimes due to an irresistible impulse.  The expert testimony before the Superior Court of the District of Columbia established that a defendant knew the difference between right and wrong when he committed the Washington D.C. offenses, which is the applicable standard in the State of Florida. An irresistible impulse is not a defense or excuse for committing a crime in the State of Florida.

> While this Court recognizes the two prior adjudications of insanity in the District of Columbia, that standard for insanity is a much lesser, more lenient standard than that which is used under the law of the State of Florida.  Additionally, the evidence presented before this Court established beyond and to the exclusion of every reasonable doubt, that the defendant was not insane at the time of the commission of the act pending before this Court.

([D.E. 125-84] at 19-20).

On February 7, 1997, Mr. Holland was sentenced to death by electrocution.[17] (*Id.* at 125-84).  For the reasons that follow, the Court finds that Mr. Holland's Sixth Amendment right to self-representation was violated and the Florida Supreme Court's decision resulted in an unreasonable determination of clearly established federal law.

---

[17] On January 14, 2000, an Act passed by the Florida Legislature was signed into law by the Governor providing for death sentences to be carried out by lethal injection and permitting persons sentenced to death to elect between lethal injection and electrocution as the method of execution. *See* 2000 Fla. Sess. Law Serv. Ch. 00-2 (S.B. 10A) (West).

## B. Application of AEDPA standards[18]

As a threshold matter, the standard of deference the Court must give to the opinion of the Florida Supreme Court is high.  In *Harrington v. Richter*, 131 S.Ct 770 (2011), the United States Supreme Court again articulated the well-known standard of deference that federal habeas courts must apply to the determinations of state courts in a federal habeas proceeding.[19]

The Court does not take this mandate lightly.  Pursuant to the AEDPA, the Court may only issue a writ of habeas corpus when "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme] Court precedents." *Id.*  Although, this

---

[18] The Petitioner urges the Court to conduct a *de novo* review of this claim because the Florida Supreme Court erroneously analyzed the claim under an abuse-of-discretion standard. ([D.E. 117] at 26, n.7).  However, because the Court finds that even under the more deferential standard required by AEDPA Mr. Holland's claim should be granted, it need not determine whether it should conduct a *de novo* review here.

[19] *Harrington* provides §2254 federal habeas courts with an explicit mandate:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87. (emphasis added).

standard is purposefully difficult to meet, the Florida Supreme Court's decision on Mr. Holland's

claim that he was denied his right to self-representation is such a decision.  Based on the record,

the Court finds there is no possibility that fairminded jurists could disagree that the Florida

Supreme Court's decision conflicts with United States Supreme Court precedent which was well-

understood and comprehended in existing federal law at the time of Mr. Holland's direct appeal.

### C. The State Court Decision

The Court must examine the Florida Supreme Court's resolution of this claim to

determine if that decision was contrary to, or an unreasonable application of clearly established

federal law *at the time* Mr. Holland's claim was denied.[20] The Florida Supreme Court denied Mr.

Holland's claim on October 5, 2000 (rehearing denied December 20, 2000).[21]  The opinion reads

---

[20] *Kokal v. Sec'y Dep't. of Corr.*, 623 F.3d 1331, 1346 (11th Cir. 2010).

[21] The thrust of the State's response is that Mr. Holland's claim must be denied based on the holding in *Indiana v. Edwards*, 554 U.S. 164 (2008).  ([D.E. 120] at 43).  However, *Edwards* was not clearly established federal law at the time of Mr. Holland's direct appeal. As such, it is not applicable to the Court's analysis pursuant to the AEDPA.  Moreover, *Edwards* made clear that the United States Supreme Court had not determined the relation of the mental competence standard to the right of self-representation until 2008.  The Supreme Court found that neither *Faretta* nor *Godinez* (which was clearly established law at the time of the Florida Supreme Court's decision on Mr. Holland's direct appeal) directly addressed the question before the Supreme Court in 2008.  *Id.* at 173.

Regardless, the Court doubts that Mr. Holland's claim would have been decided differently under *Edwards. Edwards* held that states may insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from "severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178.  Based on the record before the Court, Mr. Holland is not such a defendant.  Unlike Mr. Edwards who was diagnosed with schizophrenic illness including "delusions and marked difficulties in thinking" which caused the trial court to find that he was not competent to defend himself, the trial court here found that Mr. Holland was competent to make knowing and intelligent waivers of his right to not testify and rights during the charge conference in reference to jury instructions. This is markedly different from Mr. Edwards' mental health and competency.

as follows:

> In issue one, Holland claims that the trial court erred in denying him the opportunity to represent himself. The trial court conducted Faretta inquiries on at least two separate occasions to determine whether Holland was competent to represent himself. At the conclusion of the inquiries, the trial court denied Holland's request for self-representation.
>
> As Holland points out, "a person need not be schooled in the law in order to competently elect to represent himself." *Crystal v. State*, 616 So.2d 150, 153 (Fla. 1st DCA 1993). *See also* Fla. R.Crim. P. 3.111(d)(3)("Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent him or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel."). However, in *Johnston v. State*, 497 So.2d 863, 868 (Fla.1986), this Court stated that "[i]n determining whether a defendant has knowingly and intelligently waived his right to counsel, a trial court should inquire into, among other things: defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." In *Johnston*, this Court concluded that "[t]he trial judge made the proper inquiry ... and correctly concluded that the desired waiver of counsel was neither knowing nor intelligent, in part, because of Johnston's mental condition." *Id.* (emphasis added). *See also Visage v. State*, 664 So.2d 1101, 1101 (Fla. 1st DCA 1995).
>
> A trial court's decision as to self-representation is reviewable for abuse of discretion. *See id.* at 1101. We conclude that the trial court did not abuse its discretion in denying Holland the right to represent himself. The record contains numerous instances of Holland's unstable mental condition, particularly his previous hospitalization at St. Elizabeth's. Additionally, the trial court was aware of the potential that Holland was going to rely on the insanity defense. Moreover, it is clear from Holland's responses to the trial court's inquiries that Holland lacked sufficient knowledge of criminal proceedings:

---

Nonetheless, having been decided well after Mr. Holland's direct appeal, *Edwards* has no place here. In fact, *Edwards* does not support the State's position because it shows that before 2008, federal law was such that "the Constitution guarantees a defendant who knowingly and voluntarily waives the right to counsel, the right to proceed *pro se* at his trial." *Faretta*, 422 U.S. at 806. "A mentally ill defendant who knowingly and voluntarily elects to proceed *pro se* instead of through counsel receives a fair trial that comports with the Fourteenth Amendment." *Godinez v. Moran*, 509 U.S. at 389. As such, clearly established law in 2000 only required Mr. Holland to show that he was competent to waive his right to counsel not competent to defend himself. *See Edwards*, 554 U.S. at 172.

THE COURT: Tell me in simple terms what legal or other training you have that would assist you to represent yourself in proceedings of this nature.

THE DEFENDANT: Well, from what I've seen in the evidence, Ray Charles could come in here and represent himself and Stevie Wonder, so I don't need too much legal training to do all that.

...

THE COURT: Any training you've had, any books that you've read?

THE DEFENDANT: No.

THE COURT: Any anything?

THE DEFENDANT: No, but what I'm trying to tell you is, you know, I won't [be] violating any rules in here. I won't be disruptive.

THE COURT: Do you know the rules that you could violate?

THE DEFENDANT: No, but I'm just saying common things that—don't interrupt people, something like that.

Weeks later, when the trial court conducted another Faretta inquiry, Holland told the court that he would know when to object based on what he learned from watching "*Matlock*" on television. Finally, the following passage from the record best describes the trial court's reasons for denying Holland's requests to represent himself:

Mr. Holland originally, in 1990, filed a defense, when Mr. Giacoma and Mr. Tindall were representing him, of insanity and that was a defense which was used at trial. After this case was remanded for [a] new trial Mr. Delegal initially, and then Mr. Lewis and Mr. Baron, again relied on the defense of insanity.

Obviously, this is an issue that this Court must address in making determinations of how Mr. Holland is to proceed.

Mr. Holland on numerous occasions has indicated that he would rather represent himself. I believe it was on ... July 25th this Court conducted a Faretta Inquiry. And the Court has had previous dialogue with Mr. Holland regarding his abilities, one to understand what is taking place and the seriousness of the charges. And certainly, I believe Mr. Holland is aware that he faces the possibility of the imposition of the death penalty.

The Court discussed with Mr. Holland the factors of his childhood, which the Court is aware from prior hearings, the facts from prior hearings. Mr. Holland has suffered an injury to the head and was hospitalized at Saint Elizabeth's in Washington D.C. while he was incarcerated approximately—correct me if I'm wrong—ten, twelve years ago, approximately; is that right?

He has indicated that he has obtained a GED since he has been incarcerated. Mr. Holland has obviously sat through his prior first degree murder trial, but that is not exactly correct, because due to Mr. Holland's behavior Mr. Holland was removed from that courtroom and watched that proceeding on closed-circuit television.

So Mr. Holland has previously demonstrated, before Judge Futch in his prior trial of this case, his inability to follow the Court's orders and decorum required to be in a courtroom.

....

Mr. Holland is still, from my understanding of the pleadings that are in this case, relying on the defense of insanity. I believe that touches upon his mental condition and ability to understand the nature as well as the complexity of this case.

Based on this excerpt, it is clear that the trial court properly applied the *Johnston* factors in denying Holland the right to represent himself. Hence, we find no merit to Holland's first claim of error.

*Holland*, 773 So.2d at 1069. (footnotes omitted). Based on clearly established federal law at the time, this determination was unreasonable because the holdings of the Supreme Court regarding self-representation *at the time* of Mr. Holland's direct appeal were that a defendant choosing self-representation must be permitted to do so when competent and when the waiver is knowing and voluntary. An inquiry focused solely on the defendant's legal skills was not relevant to whether or not he was competent to waive his right of self-representation. If Mr. Holland was competent to stand trial, he was likewise competent to waive counsel. "[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that

is higher than (or even different from) the *Dusky*[22] standard." *Godinez*, 509 U.S. at 398.  On

December 14, 1995, the trial court found that Mr. Holland was competent to stand trial.  This

was the relevant finding.[23]

### D. Clearly Established Federal Law and its Application to Mr. Holland's Claim

*Faretta v. California*, 422 U.S. 806 (1975) is the foundational self-representation case.

*Faretta* expressly recognized the existence of a constitutional right to conduct one's own

defense.  *Id.*  Before Mr. Faretta's trial, the judge expressly inquired about Mr. Faretta's technical

legal knowledge. The judge did so, presumably, because in 1975 the right to self-representation

was not clearly established federal law.[24]  However, the right to self-representation was clearly

established law in 2000 when Mr. Holland's direct appeal was denied. Yet, the questions posed

to Mr. Faretta that the United States Supreme Court rejected as the wrong inquiries were quite

similar to those questions the trial court posed during Mr. Holland's numerous "*Faretta*"

---

[22] "[I]t is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960)(emphasis added).

[23] Nothing in this Order should be read to suggest that Mr. Holland was not suffering from a mental disease or defect.  The record shows that over the years Mr. Holland has been diagnosed with a variety of mental disorders.  However, simply having a mental disease or defect without such defect interfering with a defendant's *present* ability to understand the proceedings and assist counsel is not the standard for determining competency. *See generally Dusky*, 362 at 402. (emphasis added).

[24] In fact, the state court in California expressly found that such a right did not exist. *Faretta*, 422 U.S. at 811, n.4.

inquiries.[25] ([D.E. 125- 14] at 55-58).  For comparison purposes, the critical colloquy at issue in

*Faretta* was as follows:

> THE COURT: In the Faretta matter, I brought you back down here to do some reconsideration as to whether or not you should continue to represent yourself.'How have you been getting along on your research?

> THE DEFENDANT: Not bad, your Honor.'Last night I put in the mail a 995 motion and it should be with the Clerk within the next day or two.

> THE COURT: Have you been preparing yourself for the intricacies of the trial of the matter?

> THE DEFENDANT: Well, your Honor, I was hoping that the case could possibly be disposed of on the 995.'Mrs. Ayers informed me yesterday that it was the Court's policy to hear the pretrial motions at the time of trial. If possible, your Honor, I would like a date set as soon as the Court deems adequate after they receive the motion, sometime before trial.

> THE COURT: Let's see how you have been doing on your research.'How many exceptions are there to the hearsay rule?

> THE DEFENDANT: Well, the hearsay rule would, I guess, be called the best evidence rule, your Honor. And there are several exceptions in case law, but in actual statutory law, I don't feel there is none.

> THE COURT: What are the challenges to the jury for cause?

> THE DEFENDANT: Well, there is twelve peremptory challenges.

> THE COURT: And how many for cause?

> THE DEFENDANT: Well, as many as the Court deems valid.

> THE COURT: And what are they? What are the grounds for challenging a juror for cause?

---

[25] It is true that Mr. Holland's answers were not as eloquent or well-studied as Mr. Farretta's.  However, the answers to the questions are not as important as the questions themselves. The Supreme Court determined that Mr. Faretta's legal knowledge (or lack thereof) was not the basis for a denial of self-representation. *Faretta*, 422 U.S. at 836.

THE DEFENDANT: Well, numerous grounds to challenge a witness-I mean, a juror, your Honor, one being the juror is perhaps suffered, was a victim of the same type of offense, might be prejudiced toward the defendant. Any substantial ground that might make the juror prejudice(d) toward the defendant.

THE COURT: Anything else?

THE DEFENDANT: Well, a relative perhaps of the victim.

THE COURT: Have you taken a look at that code section to see what it is?

THE DEFENDANT: Challenge a juror?

THE COURT: Yes.

THE DEFENDANT: Yes, your Honor. I have done-

THE COURT: What is the code section?

THE DEFENDANT: On voir diring a jury, your Honor?

THE COURT: Yes.

THE DEFENDANT: I am not aware of the section right offhand.

THE COURT: What code is it in?

THE DEFENDANT: Well, the research I have done on challenging would be in Witkins Jurisprudence.

THE COURT: Have you looked at any of the codes to see where these various things are taken up?

THE DEFENDANT: No, your Honor, I haven't.

THE COURT: Have you looked in any of the California Codes with reference to trial procedure?

THE DEFENDANT: Yes, your Honor.

THE COURT: What codes?

THE DEFENDANT: I have done extensive research in the Penal Code, your

Honor, and the Civil Code.

THE COURT: If you have done extensive research into it, then tell me about it.

THE DEFENDANT: On empaneling a jury, your Honor?

THE COURT: Yes.

THE DEFENDANT: Well, the District Attorney and the defendant, defense counsel, has both the right to 12 peremptory challenges of a jury. These 12 challenges are undisputable. Any reason that the defense or prosecution should feel that a juror would be inadequate to try the case or to rule on a case, they may then discharge that juror.'But if there is a valid challenge due to grounds of prejudice or some other grounds, that these aren't considered in the 12 peremptory challenges. There are numerous and the defendant, the defense and the prosecution both have the right to make any inquiry to the jury as to their feelings toward the case.

*Faretta*, 422 U.S. at 814, n. 3.

After consideration of Mr. Faretta's answers above, and observation of his demeanor, the judge ruled that Mr. Faretta had not made an intelligent and knowing waiver of his right to the assistance of counsel, and also ruled that Mr. Faretta had no constitutional right to conduct his own defense. *Id.* Ultimately, the United States Supreme Court rejected this ruling and determined that "[t]he right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged." *Id.* at 818. Moreover, the United States Supreme Court recognized that this right is implied in the Sixth Amendment because "the right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.*

In Mr. Holland's case, *Faretta* could not be more applicable because it recognized that "the language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant-not an organ of the

48

State interposed between an unwilling defendant and his right to defend himself personally." *Id.*

at 820. This is so because "to thrust counsel upon the accused, against his considered wish, thus

violates the logic of the Amendment." *Id.* On more than one occasion, Mr. Holland told the

judge that he wanted to represent himself because he believed that he could mount a defense

based on a lack of evidence.[26] Instead, his counsel put forth an insanity defense.[27] An insanity

defense admits guilt but removes culpablility based a disease or mental defect.[28] These two

defense are diametrically opposed. Therefore, in a very real sense, Mr. Holland's defense at trial

was not *his* defense at all. This violates the Sixth Amendment because "[u]nless the accused has

acquiesced in such representation, the defense presented is not the defense guaranteed him by the

Constitution, for, in a very real sense, it is not his defense." *Id.* at 821.

Further, during his multiple requests to represent himself, the trial court never asked

whether or not Mr. Holland knew that he had a right to counsel and, if so, was he knowingly and

willingly giving up that right. Not once. Moreover, the trial court did not ask the right questions

about competency. The trial judge substituted technical legal competency for the competency

---

[26] (*See* [D.E. 125-14] at 55, [D.E. 125-16] at 14-89, [D.E. 125-17] at 112 & [D.E. 125-18] at 8).

[27] During the evidentiary hearing on Mr. Holland's postconviction motion, Mr. Lewis identified the defense strategy for the murder of Officer Winters as being a hybrid of self-defense, voluntary intoxication and insanity but the defense for the remaining crimes was solely insanity. (*See* [D.E. 125-107).

[28] The issue is whether he "was, by reason of said mental infirmity, disease, or defect unable to understand the nature and quality of his act or its consequences or was incapable of distinguishing right from wrong" at the time of the incident. *See Hall v. State*, 568 So.2d 882 (Fla.1990).

required to make a knowing and voluntary waiver. This cannot be reconciled with *Faretta.*[29] The

undisputed facts show that on December 14, 1995, three court appointed mental experts found

Mr. Holland to be competent to stand trial. ([D.E. 125-11] at 33-161). The trial court concurred;

finding that Mr. Holland's "thought process [wa]s intact" and "he is able to function properly and

---------------------------------

[29] The United States Supreme Court "has not precisely defined the extent of the *Faretta* inquiry." *Fitzpatrick v. Wainwright*, 800 F.2d 1057 (11th Cir. 1986). However, the Eleventh Circuit Court of Appeals applied the following factors in determining whether a valid waiver was knowing and intelligent: background, experience, and conduct of the accused; representation by counsel before trial; knowledge of the nature of the charges and the possible penalty; understanding of the requirement to follow the rules of procedure; waiver as result of coercion or mistreatment; delay or manipulate proceedings and previous involvement in criminal trials and stand-by counsel. *Id.* Here, the trial court failed to conduct an inquiry to determine if Mr. Holland was competent to waive his right to counsel. Instead, the inquiry was to determine Mr. Holland's technical skills to represent himself. Even if the trial court had inquired as to the relevant facts, it applied those facts to the wrong legal standard for competency to waive counsel.

Given Mr. Holland's answers, the trial court's own assessment of Mr. Holland's behavior and ability and the expert witness's testimony, the Court doubts that applying the factors articulated in *Fitzpatrick* would change the disposition of Mr. Holland's claim. Mr. Holland has a GED, he is familiar with the criminal justice system, the expert witnesses found him to be of average to above average intelligence. The trial judge was complementary of his intellect and there is no indication in the record that Mr. Holland behaved in a disruptive or disrespectful manner *during his re-trial*. Mr. Holland was represented by counsel before, during and after his first trial and on appeal. He was represented by counsel during his re-trial including all pre-trial hearings. The trial court stated on the record that Mr. Holland "is aware that he faces the possibility of the imposition of the death penalty." ([D.E. 125-16] at 13). Mr. Holland was reminded that he knew he would have to follow the rules, and he said he would. Mr. Holland did admit to not knowing the specific procedural rules but agreed to follow the rules as directed. He requested self-representation well in advance of trial. He has been involved in more than one criminal trial and he did request stand-by counsel. The purpose of the *Faretta* inquiry is "'not to determine the extent of a defendant's legal knowledge or to determine how good of a trial advocate a defendant will be,' but to ensure only that the defendant is aware that the rules exist and that he will be bound by them.'" *United States v. Kimball*, 291 F.3d 726, 731 (11th Cir. 2002). No such inquiry occurred in Mr. Holland's case.

appropriately." (*Id.* at 143).  After the 1995 competency finding, the record does not indicate any specific event or comment that would have caused the trial court to change its opinion of Mr. Holland's competency.  The record clearly shows that the trial court allowed Mr. Holland to make waivers of other constitutionally protected rights and determined that Mr. Holland was doing so knowingly and voluntarily. (*See* [D.E.125-62] at 33, [D.E. 125-48] at 19 & [D.E. 125-71] at 15).  These facts are not in dispute.

On March 22, 1996, six months before the re-trial began, Mr. Holland first indicated that he would like to represent himself.  The trial court conducted what it believed to be a *Faretta* inquiry and then denied Mr. Holland's request because he did not "have the requisite legal ability to represent" himself, did not have "any specific legal training, is not familiar with how a trial is conducted, even though he's sat through them in the past" and was "incapable to represent himself." ([D.E. 125-14] at 54 & [D.E. 125-78] at 88).

On August 2, 1996, Mr. Holland again requested to represent himself.  The trial court denied Mr. Holland's request because he "is not able to adequately appropriately represent himself" and that Mr. Holland was "in need of counsel" at both the guilt and penalty phase. (*See* [D.E. 125-15] at 99-108).

On August 26, 1996, the trial court was again apprised of Mr. Holland's desire to represent himself.  This time, the trial court made a formal statement on the record. For the third time, the trial court denied Mr. Holland's request. However, on this day, the trial court cited not only Mr. Holland's inability to "make objections those objections which are necessary to present his own case" but the trial court included the facts that Mr. Holland had suffered a head injury more than a decade before, his demonstrated inability to follow the Court's orders at his *prior*

*trial*, and the fact that he was relying on the defense of insanity. (*See* [D.E. 125-16] at 13)(emphasis added).   Further, the trial court also denied his request based on the "complexity of this case."   The record shows Mr. Holland made seven additional requests to represent himself during the remainder of the guilt and penalty phases.  All of his requests were denied on essentially the same bases.

The trial court clearly erred because having specific legal training or legal ability has never been the standard by which a determination should be made before criminal defendants can represent themselves under clearly established federal law dating back to, at least, 1975.[30]  To the extent there was confusion about the *Faretta* rule regarding self-representation, *Godinez v. Moran* made it clear:

> In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), we held that a defendant choosing self-representation must do so "competently and intelligently," *id.*, at 835, 95 S.Ct., at 2541, but we made it clear that the defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel, *id.*, at 836, 95 S.Ct., at 2541, and we emphasized that although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored," *id.*, at 834, 95 S.Ct., at 2541. Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," *ibid.*, a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation.

*Godinez v. Moran*, 509 U.S. 389, 400 (1993).  Similar to *Faretta*, *Godinez* was also clearly established federal law at the time of Mr. Holland's direct appeal.  In *Godinez*, the United States

---

[30] Even if the Court were to find that Mr. Holland was adequately represented by his court-appointed counsel during his re-trial, the result here is the same. "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177, n. 8 (1984).

Supreme Court determined that finding a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel.  In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary.  *Parke v. Raley*, 506 U.S. 20, 28–29 (1992) (guilty plea); *Faretta, supra*, 422 U.S., at 835 (waiver of counsel).  *See id.* at 400.  "In this sense there is a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence. FN12"

> FN12. The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the *proceedings. See Drope v. Missouri, supra*, 420 U.S., at 171, 95 S.Ct., at 903 (defendant is incompetent if he "lacks the capacity to understand the nature and object of the proceedings against him") (emphasis added). The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced. *See Faretta v. California, supra*, 422 U.S., at 835, 95 S.Ct., at 2541 (defendant waiving counsel must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open' ") (*quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)); *Boykin v. Alabama*, 395 U.S., at 244, 89 S.Ct., at 1712 (defendant pleading guilty must have "a full understanding of what the plea connotes and of its consequence").

*Id.* at 400-01.  Thus, the correct standard was *not* whether Mr. Holland was competent to represent himself because of his legal ability or training but rather was *he competent to waive his Sixth Amendment right to counsel* and was that waiver *knowing and voluntary* having been made aware of the dangers and disadvantages of self-representation, so that the record would establish that Mr. Holland knew what he was doing and his choice was made with eyes open.  *See id.*  The

record does not reveal the answer to those questions because no one ever advised Mr. Holland of this right nor did anyone conduct an inquiry to determine if his desire to represent himself was a knowing and voluntary waiver of such a right. Because the trial court focused on the wrong legal standard, these essential questions were not asked. In keeping with *Godinez*, Mr. Holland was indeed competent; whether his waiver was knowing and voluntary is unknown because the question was never asked. Yet, it is not enough that the trial court failed to conduct a proper *Faretta* inquiry or denied Mr. Holland his right to self-representation based on an incorrect standard. *See Bell v. Cone,* 535 U.S. 685, 694 (2002)( a federal habeas court is not to substitute its views for those of state courts under AEDPA because "'an unreasonable application is different from an incorrect one.'"). The question before the Court is whether the Florida Supreme Court's determination of Mr. Holland's direct appeal resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The Court must conclude that it did.

### E. The State Court Decision and §2254

To begin, the Florida Supreme Court did not analyze Mr. Holland's claim using clearly established federal law. Instead, the court analyzed Mr. Holland's claim pursuant to state law, in particular, *Johnston v. State*, 497 So.2d 863 (Fla. 1986).[31] However, this does not change the

---

[31] The correctness of the application of *Johnston* to Mr. Holland's claim is unclear. *Johnston* held that "[i]n determining whether a defendant has knowingly and intelligently waived his right to counsel, a trial court should inquire into, among other things: defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." *Johnston v. State*, 497 So.2d 863 (1986). However, before Mr. Holland's direct appeal, the Florida Supreme Court issued *Hill v State,* 688 So.2d 901 (Fla. 1996) which clearly departed from the *Johnston* logic and applied *Godinez. Hill*, 688 So.2d at 905 ("We emphasize that a defendant does not need to possess the technical legal knowledge of an attorney before being permitted to proceed pro se.").

analysis.

> A state-court decision is "contrary to" our clearly established precedents if it
> "applies a rule that contradicts the governing law set forth in our cases" or if it
> "confronts a set of facts that are materially indistinguishable from a decision of
> this Court and nevertheless arrives at a result different from our precedent."
> *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389
> (2000). Avoiding these pitfalls does not require citation of our cases-indeed, it
> does not even require awareness of our cases, so long as neither the reasoning nor
> the result of the state-court decision contradicts them.

*Early v. Packer*, 537 U.S. 3 (2002). Here, the Court has compared the record in Mr. Holland's

case with the facts in *Faretta* and does not find them materially distinguishable. *See* §2254(d)(1).

Yet, the Florida Supreme Court arrived at a contrary result. Having carefully reviewed the

---

> In 1997 (also before Mr. Holland's direct appeal), the Florida Supreme Court followed *Hill* with *State v. Bowen*, 698 So.2d 248 (Fla. 1997) which likewise held "that once a court determines that a competent defendant of his or her own free will has "knowingly and intelligently" waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented." *Bowen*, 698 So.2d at 252. When the Florida Supreme Court decided Mr. Holland's appeal, it reverted back to *Johnston* even though it quite clearly receded from the *Johnston* decision well before 2000. In fact, the Florida Rules of Criminal Procedure were amended in 1998 to reflect the *Bowen* decision. "Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel, and does not suffer from severe mental illness to the point where the defendant is not competent to conduct trial proceedings by himself or herself." FLA. CRIM. P. 3.111(d)(3).

> Further, even if the Court were to find that *Johnston* was the law applicable to Mr. Holland's claim and *Johnston* could determine the outcome of Mr. Holland's federal habeas claim, *Johnston* would not change the result here. *Johnston* stands for the proposition that when a court is making a determination of whether *a waiver of counsel was knowing and intelligent* it could take in to account "defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." *Johnston*, 497 So.2d at 868 (emphasis added). Whereas in Mr. Holland's case, the trial court took into account those same *Johnston* factors to determine that he was not competent to adequately represent himself. This is the wrong standard even under *Johnston*. Assessment of one's legal competence to represent oneself is distinctly different from whether one is competent to make a knowing a voluntary waiver of the right to represent oneself.

record, the Court concludes there is no possibility fairminded jurists could disagree that the Florida Supreme Court's decision in *Holland* directly conflicts with *Faretta* and its progeny and was unreasonable rather than simply incorrect.

During the course of Mr. Holland's proceedings, the trial judge made certain factual findings on the record.[32] Specifically, after having denied Mr. Holland's first two self-representation requests, the trial court then found that Mr. Holland suffered a head injury approximately ten to twelve years previously had also demonstrated before Judge Futch in his prior trial of this case, his inability to follow the Court's orders and decorum required to be in a courtroom. ([D.E. 125-16] at 13). The trial court also found that Mr. Holland had not demonstrated his ability to make objections which were necessary to present his own case and that Mr. Holland was relying on the defense of insanity. (*Id.*).

It is true that Mr. Holland did suffer a head injury over a decade ago, he was removed from the courtroom during his first trial, he is not experienced in the proper way to make objections in a court of law and he was relying on the defense of insanity.[33] However, the trial judge found that these four factors determined Mr. Holland's ability to represent himself; the judge did not address these factors as whether or not they reflected a knowing and voluntary

---

[32] The first two times the trial court denied Mr. Holland's requests for self-representation, the stated reason for the denial was solely his lack of "requisite legal ability" and his lack of "any specific legal training" and familiarity "with the rules of evidence, nor trial procedures" and is not familiar with "how a trial is conducted." (*See* [D.E. 125-14]). The record clearly shows that the trial judge denied Mr. Holland's requests based on his lack of formal legal education and training not on his competence to waive his right or understand the proceedings.

[33] It is arguable whether or not this defense was Mr. Holland's choice. Mr. Holland indicated that he wanted his attorneys, or if self-represented he would, pursue a reasonable doubt defense because the State lacked the evidence to prove their case of premeditation.

waiver of his right to represent himself.  Moreover, during Mr. Holland's 1995 competency

hearing, all three court-appointed expert witnesses testified that while Mr. Holland did suffer a

serious head trauma over a decade ago, this injury did not effect his current competency.[34] ([D.E.

125-11] at 33-161).  It also appears that Mr. Holland was removed from his original trial for

being disruptive.  However, nothing in the record before the Court indicates that Mr. Holland

was being disruptive at his re-trial.[35]  In fact, the trial judge stated on the record on more than one

occasion that Mr. Holland was able to function properly and appropriately and that he expressed

---

[34]  Competency is determined by a "*present* inability to assist counsel or understand the charges." *See Card v. Singletary*, 981 F.2d 481 (11th Cir. 1992)(emphasis added).

[35]  On two separate occasions, Mr. Holland suggested that the trial court appoint standby counsel.  The trial court did not acknowledge either request. (*See* [D.E. 125-15] at 99-108).

> We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. *See Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. Of course, a State may-even over objection by the accused-appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. *See United States v. Dougherty*, 154 U.S.App.D.C. 76, 87-89, 473 F.2d 1113, 1124-1126.

*Faretta*, 422 U.S. at 834, n. 46.  As one of the trial judge's grounds for denying Mr. Holland self-representation was prior disruptive behavior in the courtroom, the appointment of standby counsel could have obviated the concern. The appointment of standby counsel is a well recognized safeguard.  *See United States v. Edwards*, 716 F.2d 822, 824 (11th Cir.1983)(*per curiam* ).  The importance of the standby counsel is further enhanced when one recognizes that a defendant may waive his right to self-representation if he later decides to act as co-counsel, *Raulerson v. Wainwright*, 732 F.2d 803, 809 (11th Cir.1984), or if he abandons his initial request, *Brown v. Wainwright*, 665 F.2d 607, 611 (5th Cir.1982) *(en banc)*.

his thoughts in a very coherent and organized manner.[36] ([D.E. 125-11] at 33 & [D.E. 125-14 at 48). Further, while Mr. Holland's counsel was relying on the insanity defense, an insanity defense is retrospective as to the defendant's sanity at the time the crime was committed not at the time the defendant asserts the defense in a court of law. *See Hall v. State*, 568 So.2d 882 (Fla. 1990). The final fact found by the trial court was that Mr. Holland was not experienced in the proper way to make objections in a court of law. As noted above, this fact alone was never enough to deny a criminal defendant the right to represent himself and conduct his own defense. *Faretta*, 422 U.S. at 835. ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'")(citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

Nonetheless, the State urges the Court to deny Mr. Holland's claim because there are certain instances in which self-representation can be denied and that Mr. Holland's case is one of these exceptions. The State argues that "[a] defendant's right to represent himself will be overridden in certain situations, such as where he cannot knowingly and intelligently waive his right to counsel or where he has demonstrated an inability or unwillingness to abide by the rules of procedure and courtroom decorum." ([D.E. 120] at 36). Assuming for our purposes that the State is correct, the record does not establish that either one of these situations occurred in Mr. Holland's case. The State categorizes Mr. Holland's repeated requests to represent himself as

---

[36] Additionally, one of the expert witnesses who testified at Mr. Holland's competency hearing testified that while it was possible that Mr. Holland could behave inappropriately in court, her "feeling was that he would very likely be appropriate." ([D.E. 125-11] at 93).

"tirades" and argues that the "trial court had seen Holland's behavior and tirades in its own

courtroom and had assessed Holland's ability to participate in the legal process." ([D.E. 120] at

42-43).  The State further argues that "[t]he trial court is in the best position to assess a

defendant's behavior and to determine whether a waiver of his right to counsel is knowing and

intelligent and whether he can abide by the rules and protocols of a trial."[37] ([D.E. 120] at 43).

It is true that a trial court is in the best position to assess a defendant's behavior.  Here,

the trial court assessed that Mr. Holland "voiced his concerns and issues in a most eloquent

manner" and was able to "function properly and appropriately." ([D.E. 125]at 143).  More

importantly, the court also found that Mr. Holland expressed his thoughts in a "very coherent and

organized manner" on the same day that Mr. Holland was first denied self-representation. ([D.E.

125-14] at 48).  During that same hearing, the trial court reiterated its previous finding that "Mr.

Holland is competent." (*Id.* at 54).  Later, during the re-trial, the trial court instructed defense

counsel to ask the venire panel a question at Mr. Holland's request, despite the fact that counsel

felt it was "so prejudicial to the case" that he did not want to ask the jurors. ([D.E. 125-27] at

15).  The trial court sided with Mr. Holland because "it's a discretionary call.  And different

attorneys may have different strategies or beliefs as to what is prejudicial or not to their client."

---

[37] The State cites to portions of the record which the State concludes support the findings
of the trial court. ([D.E. 120] at 39).  However, the facts the State cites are not the same facts that
were expressed by the trial court in its denials of Mr. Holland's multiple *Faretta* motions. For
example, the State cites Mr. Holland's complaints about his lack of law library privileges and
lack of depositions and tapes. (*See* [D.E. 120] at 39).  However, the trial court did not find either
of these requests unreasonable.  In fact, the trial judge granted both requests and issued orders
favorable to Mr. Holland.  (*See* [D.E. 125-5] & [D.E. 125-9]).  Moreover, complaints about one's
current and former counsel, judicial bias, lack of law library privileges and lack of access to
documents are not the criteria for a competency determination. *See Godinez v. Moran*, 509 U.S.
389, 401 (1993).

([D.E. 125-27] at 16). Further, the trial court also found Mr. Holland was making a knowing and voluntary waiver of his rights when he initially decided not to testify.[38] ([D.E. 125-48]). The trial court also found that Mr. Holland made a knowing and intelligent waiver of his rights during the charge conference in reference to lesser included offenses in the jury instructions. ([D.E. 125-62] at 3). In the sentencing order, the trial court also found that Mr. Holland had "participated in tactical decisions with counsel." ([D.E. 125-84] at 19). The trial court gave Mr. Holland's mental health mitigating factor little weight because of the "defendant's active participation during his trial and volitional decision at times not respond to the Court outside the presence of the jury, clearly establish his ability to participate, manipulate and engineer his actions." (*Id.*). Moreover, the trial court wholly rejected Mr. Holland's prior adjudications of insanity as mitigation because "that standard for insanity in [the District of Columbia] is a much lesser, more lenient standard than that which is used under the law of the State of Florida." ([D.E. 125-84] at 19). Thus, accepting the State's argument that the trial court is in the best position to assess a defendant's behavior and make competency determinations, the record shows that the trial court found Mr. Holland competent to make knowing and intelligent decision regarding other constitutional rights except his right to self-representation. Further, the trial court rejected the same factors it utilized to deny Mr. Holland's request for self-representation when Mr. Holland later sought to use them in mitigation of his death sentence.[39]

---

[38] Ultimately, Mr. Holland did testify in his own defense. (*See* [D.E. 125-48]).

[39] Similarly, the State argued in its sentencing memorandum that Mr. Holland's history of mental illness should be given little or no weight because Mr. Holland "correctly argued case law, argued with this Court, as well as undersigned counsel, and assisted his attorneys in the presentation of his defense." ([D.E. 125-83] at 26).

The relevant question regarding Mr. Holland's right to self-representation was whether or not he knew that he had the right to counsel under the Sixth Amendment and was he competent to knowingly and intelligently waive that right. The failure to inquire is crucial because the record before the Court does not show that the trial court's findings were either relevant to that question or, even applying the wrong standard, supportive of the denial of the right. Likewise, the Florida Supreme Court failed to apply clearly established federal law on direct appeal. This violated Mr. Holland's right to represent himself under both *Faretta* and *Godinez*. These facts, in combination with the unequivocal statements made by the trial judge, confirms what was already clear: the trial judge applied the wrong standard and denied Mr. Holland his right to self-representation based on his lack of formal legal training and knowledge of the applicable rules of evidence or procedure. *See Faretta*, 422 U.S. at 835.

The Court understands a trial judge's inclination that a person facing the criminal justice system's ultimate punishment should be represented by qualified counsel. It is desirable, perhaps, admirable for a judge to want to save someone from himself. Indeed, the trial court found that "[t]he stakes are too great" for Mr. Holland to represent himself. However, the law was clear that while a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored" *Id.* at 834. Here, the Court does not decide whether Mr. Holland was capable of providing himself with the representation of a skilled lawyer. Rather, the Court determines that no decision of the United States Supreme Court clearly established that the Constitution required Mr. Holland to do so before he may represent himself. "Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,' *ibid.*, a criminal defendant's ability to represent

himself has no bearing upon his competence to *choose* self-representation." *Godinez v. Moran*,

509 U.S. 389, 400 (1993)(citing *Faretta v. California*, 422 U.S. 806 (1975))(emphasis in

original). Therefore, habeas relief is granted as to Claim One.

## II. RIGHT TO REMAIN SILENT

Mr. Holland's second claim for habeas relief is that the trial court erred in admitting

testimony from mental health experts, Dr. Kaprowski (regarding Mr. Holland's insanity defense)

and Dr. Block-Garfield (regarding Mr. Holland's competency to stand trial). Both of these

mental health experts reviewed an expert report drafted by another physician, Dr. Abbey Strauss,

even though the Florida Supreme Court had previously ruled Dr. Strauss' report inadmissible.

([D.E. 117] at 37). Mr. Holland further argues that the trial court also erred when it denied Mr.

Holland's motion to recuse the State Attorney's office. (*Id.*). The State responds that the Florida

Supreme Court properly denied Mr. Holland's claim and that his claim as to Dr. Kaprowski[40] is

procedurally barred. ([D.E. 120] at 47). Mr. Holland replies that the State "has made a blatantly

false assertion to this Court" when it represented that the Florida Supreme Court found Mr.

Holland's claim as to Dr. Kaprowski to be abandoned or procedurally barred. ([D.E. 130] at 17).

This claim's origins stem from Mr. Holland's initial trial in 1991.

### A. Relevant Facts

The Florida Supreme Court found that the relevant facts from Mr. Holland's initial trial

were:

> Holland invoked his rights to counsel and to remain silent during his first
> appearance on July 30, 1990. The judge indicated at the hearing that he would
> sign an order prohibiting law enforcement interviews outside the presence of

---

[40]In the record, Kaprowski is also spelled as "Koprowski".

Holland's attorney. After the judge entered his order dated July 30, 1990, Strauss, a contract psychiatrist with the Broward County Jail, examined Holland twice in jail in August 1990 to help determine whether Holland needed further mental-health evaluation or could be put into the jail's general population. There was no notice to counsel. The State, however, later contacted Strauss and secured his testimony on the issues of Holland's competency and sanity. Strauss was the State's only expert witness at the competency hearing and was a key prosecution witness on the issue of insanity.

The record reflects that Strauss's testimony drew almost exclusively on his observations and impressions from his August jail visits. Strauss testified at the competency hearing that after his two visits at the jail he concluded Holland was malingering. Although Strauss later reviewed additional information, including records of Holland's earlier psychiatric hospitalization, he testified that the information simply reinforced his initial conclusion. During his testimony, Strauss also suggested that Holland might have responded differently to him during the jail visits if Holland had known the results would be used on the issue of competency.

Strauss's testimony that Holland was competent to stand trial was crucial because the court-appointed mental health experts testified that Holland was incompetent. The trial judge noted that he had never gone against court-appointed mental health experts, but he nonetheless agreed with Strauss and found Holland competent to stand trial. Thus, the error in allowing Strauss's testimony on competency cannot be harmless.

*Holland v. State*, 636 So.2d 1289, 1291 (Fla. 1994).  Because the Florida Supreme Court held that Dr. Strauss' testimony was inadmissible at his first trial, the State offered different mental health experts to testify at Mr. Holland's re-trial.  However, the State's new experts were provided with a copy of Dr. Strauss' inadmissible report.  This undisputed fact forms the basis of Mr. Holland's current claim of trial error when, after suppression hearings held on April 25 and 28, 1995, the judge denied Mr. Holland's motion to disqualify experts and to recuse the Broward County State Attorney's Office. ([D.E. 125-6, 125-7 & 125-8]).  Below is a summary of all the testimony given at the suppression hearings held in April of 1995.  However, only two doctors, Dr. Kaprowski and Dr. Block-Garfield, ultimately testified on behalf of the State during Mr. Holland's second trial in 1996.

At the April 1995 hearings to suppress the expert testimony, Dr. Trudy Block-Garfield, Dr. William Love, Dr. James Jordan, Dr. Abbey Strauss, and Dale Nelson (the State Attorney's investigator) testified. Dr. Block-Garfield testified that she did not recall either speaking to or reading Dr. Strauss' report regarding Mr. Holland. ([D.E. 125-6] at 84). Dr. Love testified that he recalled reading Dr. Strauss' report and deposition transcript. (*Id.* at 93). Dr. Jordan testified that he did receive a copy of Dr. Strauss' report and gave it "consideration" but he relied on his personal contact with Mr. Holland when reaching his ultimate expert opinion. ([D.E. 125-7] at 12). The trial court ultimately denied Mr. Holland's motion.[41]

On direct appeal, Mr. Holland claimed error. The Florida Supreme Court affirmed the denial stating:

> We address issues three and four together. In issue three, Holland asserts the trial court abused its discretion in denying Holland's motion to exclude the testimony of the State's mental health experts. As pointed out above, after the first trial in this case, this Court reversed for a new trial due to the improper admission of Dr. Strauss' testimony in violation of Holland's right to counsel and right to remain silent. In issue three Holland alleges that the State gave Dr. Strauss' report to Dr. Kaprowski, who subsequently testified during the second trial regarding Holland's sanity, and to Dr. Block–Garfield, who testified at the competency hearing. In issue four, Holland argues that the trial court erred in failing to disqualify state attorney Michael Satz and the state attorney's office because Satz and his office had knowledge concerning Dr. Strauss' report and this report may have provided the State an "investigative lead."
>
> To support these claims, Holland relies on *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In *Kastigar*, the United States Supreme Court held that the government can compel testimony from an unwilling witness by conferring immunity from the use of the compelled testimony and evidence derived therefrom in subsequent criminal proceedings (use and

---

[41] The trial court held the defense's motion regarding Dr. Kaprowski in abeyance. ([D.E. 125-8] at 101). Dr. Kaprowski did not testify at the hearing. On June 26, 1995, the trial court entered an order finding that Dr. Kaprowski's "testimony be admisable [sic]." ([D.E. 125-77] at 81).

derivative use immunity). *See id.* at 448, 92 S.Ct. 1653. The Court added that in a subsequent criminal prosecution, the government has the burden of establishing that the evidence it proposes to use is derived from a source wholly independent of the compelled testimony. *See id.* at 460, 92 S.Ct. 1653.

We do not find *Kastigar* to be analogous to the present case. This is not a case where the state attorney's office granted a defendant use immunity in exchange for testimony and later proceeded to charge that defendant with a crime. Therefore, *Kastigar* does not apply, as the underlying reasons for requiring the prosecution to establish an independent source for evidence are not implicated in the present case.

Further, we find no merit to Holland's claim that the experts' reliance on Dr. Strauss' report violated his right to counsel and right to remain silent. Holland failed to present any evidence at the motion hearing to establish that Dr. Kaprowski relied on Dr. Strauss' report. Further, Dr. Block–Garfield testified at the motion hearing that she never spoke to Dr. Strauss nor did she review or rely upon Dr. Strauss' report. Thus, the taint from Dr. Strauss' report did not extend to Dr. Block–Garfield's testimony. Therefore, it was not error to permit the two doctors to testify.

Moreover, we find no error in the trial court's refusal to disqualify Satz and the state attorney's office. Holland has failed to demonstrate actual prejudice that would require disqualification. *See Farina v. State*, 679 So.2d 1151, 1157 (Fla.1996), *receded from on other grounds*, *Franqui v. State*, 699 So.2d 1312, 1320 (Fla.1997).

*Holland v. State*, 773 So.2d 1065, 1071-72 (Fla. 2000).

In order to prevail on his claim, Mr. Holland must first establish that the state court identified the correct legal principle but applied it incorrectly to the facts before it. Once this is done, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. *See also Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003). Significantly, an "objectively unreasonable application of federal law is different from an incorrect application of federal law." *Woodford v. Visciotti,* 537 U.S. 19, 24-25 (2002). An "unreasonable application" can also occur if a state court "unreasonably extends,

65

or unreasonably declines to extend, a legal principle from Supreme Court case law to a new

context." *Putman v. Head,* 268 F.3d 1223, 1241 (11ᵗʰ Cir. 2001).

### B. Inadmissible Testimony

Mr. Holland asserts that because the Florida Supreme Court had "already ruled that Dr.

Strauss's interviews were performed in violation of the Constitution, and that those interviews

provided the basis for the expert's findings" then if different expert witnesses reviewed that

report at a later time before Mr. Holland's re-trial, his constitutional rights were violated. (*See*

[D.E. 117] at 38-39).  Mr. Holland concedes that "[w]hile the rule of *Kastigar* has most

commonly been applied to immunity situations, it is equally applicable to situations involving

statements taken in violation of the Fifth or Sixth Amendments." ([D.E. 117] at 39)(citations

omitted).  Moreover, Mr. Holland argues that"[b]ecause the Florida Supreme Court's decision

was contrary to and/or an unreasonable application of the *spirit and rule* of *Kastigar"* habeas

relief is warranted. ([D.E. 117] at 40)(emphasis added).  Accordingly, Mr. Holland argues that

the Court should grant habeas relief because the Florida Supreme Court unreasonably declined to

extend *Kastigar* to apply to Mr. Holland's claim.  The Court must reject Mr. Holland's

argument.[42]

First, *Kastigar v. United States,* 406 U.S. 441 (1972), held that the government may

---

[42]  Accepting as true that both Drs. Kaprowski and Block-Garfield had been given a copy of Dr. Strauss' report, Mr. Holland does not argue, because the record does not show, that either of these experts relied on this report when making their expert determinations. ([D.E. 125-8] at 101)(Dr. Koprowski did not testify at the hearing but submitted an affidavit stating that she "did not rely on, or in any way base my opinion or testimony on any observation conduct [sic] by Doctor Abbey Strauss.").  Indeed, Dr. Block-Garfield testified that she did not recall ever reading Dr. Strauss' report.  Further, Mr. Holland does not argue how the information, obtained by Dr. Strauss in violation of his Fifth Amendment rights, was used as an investigative lead or any other derivative use at the re-trial.

compel witnesses to testify at trial or before a grand jury, on pain of contempt, so long as the witness is not the target of the criminal case in which he testifies. *Kastigar*, 406 U.S. at 441. *Kastigar* further held that incriminating testimony could be compelled so long as the statements (or evidence derived from them) cannot be used against the speaker in a criminal case. *Id.* at 458. This is not the factual scenario before the Court. Second, Mr. Holland does not cite another opinion from the United States Supreme Court which stands for the proposition that he asserts here. As such, the Court cannot find that the Florida Supreme Court's decision was an unreasonable application of clearly established federal law.

Even if the Court believed the Florida Supreme Court's determination to be an incorrect one, under AEDPA deference, that alone is not enough to grant habeas relief. The Court must find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 131 S.Ct. 770, 783 (2011). In other words, as a condition for obtaining habeas corpus from a federal court, Mr. Holland must show that the state court's ruling on the claim being presented here was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *See id.* Mr. Holland does not argue that there was existing clearly established federal law that the Florida Supreme Court misunderstood or miscomprehended, instead he argues that the Florida Supreme Court's decision was an unreasonable application "of the *spirit and rule* of *Kastigar.*" ([D.E. 117] at 39)(emphasis added). The Court cannot grant habeas relief on novelty alone. *See Premo v. Moore*, 131 S.Ct.

733, 743 (2011).  Habeas relief is denied.[43]

## C. Recusal of the State Attorney's Office

Mr. Holland also asserts that because the State Attorney's Office had been "exposed to the testimony that had been previously ruled inadmissible as violative of the Petitioner's constitutional rights" the State Attorney and his staff should be recused.  Mr. Holland also argues that the Florida Supreme Court "erroneously evaluated this clam under state law standards for recusal rather than the constitutional analysis presented and warranted." ([D.E. 117] at 40).

Mr. Holland made this claim on direct appeal.  The Florida Supreme Court rejected it because "Holland has failed to demonstrate actual prejudice that would require disqualification. *See Farina v. State*, 679 So.2d 1151, 1157 (Fla.1996), *receded from on other grounds*, *Franqui v. State*, 699 So.2d 1312, 1320 (Fla.1997)." *Holland*, 773 So.2d at 1072.  Here, Mr. Holland asserts that because the state court evaluated this claim pursuant to state law, the Court owes Florida Supreme Court's decision no AEDPA deference.  The State responds that "[s]ince the FSC denied this claim on independent state grounds which supports the denial of habeas corpus relief" that the Court *must* deny relief.   The Court disagrees with both parties' positions.

The United States Supreme Court has interpreted an "adjudication on the merits" broadly enough to encompass summary adjudications or decisions using the language of state law.  As the Eleventh Circuit has noted:

> With these anchors in place, an "adjudication on the merits" is best defined as any state court decision that does not rest solely on a state procedural bar. *See Jason O. Williams v. Allen*, 598 F.3d 778, 796 (11th Cir.2010) (" 'A decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of

---

[43] Having found the entire claim to be without merit, the Court did not engage in an analysis of the procedural bar regarding Dr. Kaprowski as argued by the State.

the form in which it is expressed.' " (*quoting Blankenship v. Hall*, 542 F.3d 1253, 1271 n. 4 (11th Cir.2008))); *Wright*, 278 F.3d at 1255–56 (same). In *Harrington*, the Supreme Court essentially defined the term as such. The Court wrote: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 131 S.Ct. at 784–85 (emphasis added) (citations omitted). FN16 Therefore, unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petitioner's claim "is the same claim rejected" by the state court. *Early*, 537 U.S. at 8, 123 S.Ct. at 364.

*See Childers v. Floyd*, 642 F.3d 953, 968-69 (11th Cir. 2011)(footnote omitted).

Mr. Holland argues that the Florida Supreme Court evaluated this claim under state law standards for recusal rather than under the constitutional due process standard. That may be so. However, nothing in the Florida Supreme Court's rejection of Mr. Holland's claim indicates that the denial rested solely on a state procedural rule. Therefore, it is presumed that the state court has rendered an adjudication on the merits because Mr. Holland's claim here is the same claim rejected by the state court. The Florida Supreme Court clearly did not apply a procedural bar. As such, the Court presumes that the state court rendered an "adjudication on the merits." *See Childers*, 642 F.3d at 969. Accordingly, Mr. Holland's request for a *de novo* review is rejected.

On the opposite end of the spectrum, the State argues that the Florida Supreme Court "denied this claim on independent state grounds" and therefore, must be denied here also. In support, the State cites *Harris v. Reed*, 489 U.S. 255 (1989) and *Mills v. Singletary*, 161 F.3d 1273, 1287 (11th Cir. 1998). ([D.E. 120] at 51). Neither of these cases support the State's position. Both *Harris* and *Mills* stand for the proposition that a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar and the bar provides an adequate and independent

69

state ground denying relief.  Mr. Holland's claim was not procedurally barred.  Rather, the

Florida Supreme Court found that Mr. Holland failed to show actual prejudice.  Accepting the

State's position here as true, any time a state court denied a claim citing only state law, a federal

habeas court would be precluded from review because the decision was denied on an

independent state ground.  This is simply not so.  Indeed, as illustrated above, absent any

indication or state-law procedural principles to the contrary, it is presumed the state court

decision was an adjudication on the merits as interpreted by the AEDPA.

 Presented with an adjudication on the merits of Mr. Holland's claim, the Court may grant

Mr. Holland's petition for a writ of habeas corpus only if the Florida Supreme Court's ruling was

"contrary to, or involved an unreasonable application of, clearly established Federal Law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  In support of

this claim, Mr. Holland's again cites *Kastigar*.[44]  Similar to his claim regarding the expert

witness testimony, the Court does not find *Kastigar* applicable here.  More importantly, Mr.

Holland's claim fails because the United States Supreme Court has never clearly established that

evidence obtained by the State which is later determined to be inadmissible at trial (because the

defendant's right to remain silent and right to counsel were violated) prompts the recusal of the

entire State Attorney's Office.  The United States Supreme Court has held on numerous

occasions that it is not "an unreasonable application of clearly established Federal law" for a state

---

[44]  Mr. Holland also cites cases from the Circuit Courts of Appeal.  Ironically, one of the cases cited by Mr. Holland is *United States v. Semkiw*, 712 F.2d 891 (3d Cir. 1983) which remanded the case for an evidentiary hearing in order for the district court to hear testimony regarding *prejudice* to the defendant. ("It follows that we are also unable to determine whether defendant was *prejudiced* by any violation of his immunity."). *Id.* at 895 (emphasis added). Here, the Florida Supreme Court also utilized a *prejudice* standard in denying Mr. Holland's claim *after* an evidentiary hearing was held.

court to decline to apply a specific legal rule that has not been squarely established by the Court. *See Wright v. Van Patten*, 552 U.S. 120 (2008) (per curiam); *Schriro v. Landrigan*, 550 U.S. 465, 478, (2007); *Carey v. Musladin,* 549 U.S. 70 (2006). As such, the Florida Supreme Court's rejection of Mr. Holland's claim did not "involve [an] unreasonable application o[f] clearly established Federal law, § 2254(d)(1)." *Berghuis v. Smith*, 130 S.Ct. 1382, 1395 (2010). Again, habeas relief is denied.

### III. HARMLESS ERROR ANALYSIS

At the re-trial, Mr. Holland objected to the admission of an inaudible videotape and certain improper opinion testimony. The trial court overruled the objections. On direct appeal, the Florida Supreme Court determined this was error but that it was harmless error. *See Holland*, 773 So.2d at 1072.

Mr. Holland's third claim for habeas relief is that the Florida Supreme Court's harmless error determination "violate[d] Supreme Court precedent and thus warrants habeas relief." ([D.E. 117] at 45). The State responds that the Florida Supreme Court "cited the correct standard and found any error harmless. This is neither contrary to nor an unreasonable application of Supreme Court precedence [sic]." ([D.E. 120] at 55). Mr. Holland replies that the State "appears to have misunderstood Mr. Holland's claim." ([D.E. 130] at 19). Mr. Holland disagrees with the State's interpretation of his claim; it is not that "the Florida Supreme Court cannot engage in a harmless error analysis as to these two particular pieces of evidence and testimony. Rather, a harmless error analysis must itself comport with constitutional standards." (*Id.* at 19). Mr. Holland argues that the Florida Supreme Court erred in determining that although the trial court erred when it allowed the admission of an inaudible videotape and improper opinion testimony

that error was harmless.

## A. Inaudible Videotape

This claim has a long history.  It began on July 1, 1991, during Mr. Holland's first trial. Defense counsel moved to suppress a video-taped interview of Mr. Holland taken by the City of Pompano Beach police. ([D.E. 125-1] at 13).  Shortly after his arrest, the Pompano Beach police department video recorded two separate interviews with Mr. Holland.  The first recording was audible; however, the second recording was inaudible.  Nonetheless, the trial court denied the suppression motion.  The inaudible videotape was admitted and the police officer "recreated the conversation that he had with [Mr. Holland]" while on the stand. ([D.E. 125-6] at 25).  At Mr. Holland's re-trial, the defense again requested that the court disallow the admission of the inaudible videotape.  The trial judge conducted a hearing outside the presence of the jury wherein Sergeant Kevin Butler testified that there was a problem with the audio on the second videotape because the camcorder was in the monitor room and not in the interrogation room during the second interview.  ([D.E. 125-36] at 14).  After hearing argument, the trial court denied the defense's motion and allowed the admission of the videotape because "[t]he court finds there is no wrong doing" and "finds there is nothing prejudicial by it's entry, that, in any way, effects the jury having the opportunity to view, too." ([D.E. 125-36] at 21).[45]  Mr. Holland first raised this claim on direct appeal.  The Florida Supreme Court denied relief.

> In issue six, Holland alleges that the trial court abused its discretion in overruling Holland's objections to the admissibility of a videotape of the interrogation of

---

[45] Before the admission of the inaudible videotape, Mr. Holland advised the trial judge that had he been representing himself, he probably would not have agreed with showing the audible videotape to the jury either, as his counsel did without objection.  (*See* [D.E. 125-36] at 23-24).

Holland. Holland moved to suppress the videotape because the tape was mostly inaudible. The State argued that the videotape was being offered to show Holland's demeanor during the interrogation. The trial court subsequently permitted the introduction of the videotape. We agree with Holland that the tape should not have been admitted.

Through no fault of the defendant, the jury was unable to hear most, if not all, of the defendant's responses due to the poor quality of the tape. Yet, the jury was able to hear most of the questions that were asked by the interrogating detective. This allowed the jury to speculate what the defendant's answers were to these questions, a result which was prejudicial to the defendant. The State directs our attention to *Odom v. State*, 403 So.2d 936, 940 (Fla.1981), where this Court stated that "[p]artial inaudibility or unintelligibility is not a ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible." However, we believe that the language in *Odom* is distinguishable from the present case. In *Loren v. State*, 518 So.2d 342, 352 n. 4 (Fla. 1st DCA 1987), the First District Court of Appeal stated that "Florida courts have followed the general rule that ... recordings are admissible unless the inaudible and unintelligible portions are so substantial as to deprive the remainder of relevance." The inaudible portions of the tape in the present case, which encompassed most, if not all, of Holland's statements, are so substantial as to deprive the remainder of relevance. As a result, we hold that the trial court erred in admitting the videotape. Nevertheless, we find this error harmless because the interrogating detective properly testified regarding what Holland said to him during the interrogation. We conclude beyond a reasonable doubt that the error in admitting the tape did not affect the jury verdict. *See State v. DiGuilio*, 491 So.2d 1129 (Fla.1986).

*Holland v. State*, 773 So.2d 1065, 1072-73 (Fla. 2000). Although the Florida Supreme Court did not cite any clearly established federal law when denying Mr. Holland's claim, it appears from the text of the opinion that the court applied the "harmless beyond a reasonable doubt" standard, commonly known as the *Chapman* standard. *See Chapman v. California*, 386 U.S. 18 (1967).

Mr. Holland does not disagree that this is the appropriate standard. Rather, he argues that the Florida Supreme Court's analysis "failed to consider" the importance of the relation of the videotape to the State's case against him. (*See* [D.E. 117] at 48). In support of that argument, Mr. Holland cites to portions of the State's closing argument wherein the prosecutor "urged the

jury to consider the videotape when assessing the credibility of key evidence in this case, that is, the credibility of Butler versus that of the Petitioner." ([D.E. 117] at 50).  Mr. Holland asserts that the Florida Supreme Court "looked at the evidence in a static way" and that important issues were "overlooked" by the court.  (*Id.* at 47).  Accordingly, Mr. Holland argues that "[b]ecause the Florida Supreme Court's decision was an unreasonable application of Supreme Court decisions, habeas relief is warranted." ([D.E. 117] at 50).  Mr. Holland's argument is purely speculative.[46]

The issue raised by Mr. Holland now is the Florida Supreme Court's application of the *Chapman* standard.  "To prevail on an argument involving an unreasonable application of federal law, a petitioner 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 786–87.  Based on the state court record, the Court cannot say that the Florida Supreme Court's determination that the error in admitting the tape was harmless beyond a reasonable doubt because it did not affect the jury's verdict was "so lacking in justification" that fairminded jurists could not disagree.

Mr. Holland also urges the Court to consider not only the permissible evidence but also

---

[46] The Florida Supreme Court "conclude[d] beyond a reasonable doubt that the error in admitting the tape did not affect the jury verdict." *Holland*, 773 So.2d 1073.  The Court does not assume that because the Florida Supreme Court did not detail the precise process it undertook before reaching its conclusion that it did not consider "key evidence" in the case.  In fact, the state court is not required to do so.  "'We emphasize, however, that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits.'  But where 'the state courts have taken the time and resources to issue an opinion explaining their decision, a federal court must consider it and give it deference.'" *Harrington v. Richter*, 131 S.Ct. 770, 786–87 (2011).  Here, the Florida Supreme Court applied the appropriate standard.  *See Chapman*, 386 U.S. at 18 (the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt.").

the effect of the inadmissable evidence on the outcome of the case because "[t]he inaudible portions of the tape could have led to all sorts of surmise and speculation on part of the jury." ([D.E. 117] at 47). The Court has done so and based on the record finds that the Florida Supreme Court's conclusion that the error was harmless was not an unreasonable application of federal law. *See Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

The Florida Supreme Court did not determine that the trial court's admission of the videotape was not without error. Indeed, the court specifically found it was error, but it found that error was harmless beyond a reasonable doubt because it did not affect the jury's verdict. The record supports that conclusion. At the re-trial multiple witnesses testified regarding both Mr. Holland's guilt[47] and his mental status as it related to his legal culpability.[48] The Court does not find it unreasonable for the Florida Supreme Court to have determined beyond a reasonable doubt that the admission of the videotape did not affect the jury's verdict.

However, even if the Court were to disagree with the conclusion of the state court, this alone would not be enough to grant habeas relief because the Court would have to find "that the

---

[47] Mr. Holland did not deny that he shot and killed Officer Winters. Rather, he argued that he was insane at the time of the offense, was also under the influence of crack cocaine, and may have acted in self-defense. Mr. Holland disputed that he was able to form the premeditation required for a first degree murder conviction. ([D.E. 125-32] at 50-59).

[48] The Court is acutely aware that the analysis may have been different had Mr. Holland been representing himself and had not argued legal insanity to the jury as his defense but the harmless error analysis cannot speculate on a defense that was never presented to the jury. There was enough evidence presented regardless of the erroneously admitted evidence to support the verdict.

state court's ruling on the claim being presented in federal court was so lacking in justification

that there was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement." *Harrington*, 131 S.Ct. at 786-87.  The Court does not.  Moreover,

even if the Court were to conduct a plenary review of this claim, the appropriate standard for a

federal habeas court to apply to harmless error claims on collateral review is the "actual prejudice

standard" of *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Fry v. Pliler*, 551 U.S. 112, 127

(2007); *see also Vining v. Sec'y, Dep't of Corr.*, 610 F.3d 568, 571 (11th Cir. 2010).  This

standard requires the Court to determine "'whether [an] error 'had substantial and injurious effect

or influence in determining the jury's verdict.'" *Id.* at 571.  The Court does not find that it does.

Habeas relief is denied as to this sub-claim.

### B. Improper Opinion Testimony

Mr. Holland also asserts that the Florida Supreme Court erred when it determined that it

was harmless error for the State's psychologist, Dr. Daniel Martell, to "express his opinion as to

whether a gun had been hidden." ([D.E. 117] at 50).  Mr. Holland raised this claim on direct

appeal.[49]  The Florida Supreme Court also rejected the claim. It analyzed as follows:

---

[49] Now, Mr. Holland argues not only the individual error of allowing Dr. Martell to testify
as to his opinion but also to a cumulative effect of the errors deemed harmless by the Florida
Supreme Court. ([D.E. 117] at 51)("Singularly or certainly cumulatively, the State cannot
establish that these errors did not have a substantial injurious impact on the outcome of the
Petitioner's capital trial.").  Mr. Holland did not make a cumulative effects claim on direct appeal
so he is foreclosed from bringing one here. (*See* [D.E. 125-101]).  To properly exhaust state
remedies, Mr. Holland must fairly present every issue raised in his federal petition to the *state's
highest court*. *Castille v. Peoples*, 489 U.S. 346, 351 (1989)(emphasis added).  "When a
petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an
opportunity to address those claims in the first instance' and frustrates the State's ability to honor
his constitutional rights." *Cone v. Bell*, 129 S.Ct. 1769, 1780 (2009)(internal citations omitted).

Ordinarily, a federal habeas corpus petition which contains unexhausted claims is

In issue ten, Holland alleges that the trial court abused its discretion in denying Holland's objections to certain testimony regarding where Officer Winters' gun was found. The gun was located between some rocks in a field near the murder scene. Dr. Martell, a mental health expert, was called by the State to rebut Holland's defense of insanity. Dr. Martell testified that it was his opinion from looking at the photograph of the location where the gun was found that the gun was hidden by Holland and not randomly dropped. After the defense objected, the State further questioned Dr. Martell:

> Q: (by the State): Doctor, let me ask you a question with reference to the gun; did you see any photographs of the gun?
>
> A: (by Dr. Martell): I did.
>
> Q: Okay, and how did it appear to you?
>
> A: It was clear to me, from looking at the location where the gun was found, that a gun would not end up in that place in that position, randomly. It had to be placed there.
>
> Q: That's your opinion?
>
> A: That's my opinion.

Holland argues that the trial court erred in admitting this testimony because Dr. Martell had no expertise which would qualify him to testify as to whether a gun was placed or randomly dropped. We agree.

"A trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court's ruling on such matters will be upheld." *Finney v. State*, 660 So.2d 674, 682

---

dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982), allowing Mr. Holland to return to the state forum to present his unexhausted claim. However, such a result in this instance would be futile, since Mr. Holland's unexhausted claim is now incapable of exhaustion at the state level and would be procedurally barred under Florida law. Mr. Holland has already pursued a direct appeal and filed his Rule 3.851 motion in state court, with the denial of the motions affirmed on appeal. Because there are no procedural avenues remaining available in Florida which would allow Mr. Holland to return to the state forum and exhaust the subject claim, the claim is likewise procedurally defaulted from federal review. *Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990)(where dismissal to allow exhaustion of unexhausted claims would be futile due to state procedural bar, claims are procedurally barred in federal court as well). Habeas relief as to any cumulative impact of errors made by the trial court is denied.

(Fla.1995). However, in *Gilliam v. State*, 514 So.2d 1098, 1100 (Fla.1987), this Court concluded that a medical examiner should not have been allowed to testify regarding whether certain marks left on the decedent's body were caused by a sneaker found at the scene:

> An expert witness may testify only in his or her area of expertise. An expert opinion must not be based on speculation, but on reliable scientific principles. *See Delap v. State*, 440 So.2d 1242 (Fla.1983). This medical examiner was not qualified as an expert in shoe patterns. Her testimony was neither reliable nor scientific and should not have been allowed.

> *See also Goodyear Tire & Rubber Co. v. Ross*, 660 So.2d 1109, 1111 (Fla. 4th DCA 1995) ("We agree that it is not enough that the witness be qualified to propound opinions on a general subject; rather he must be qualified as an expert on the discrete subject on which he is asked to opine.").

> In the present case, Dr. Martell was not qualified as an expert in crime scene evidence. Therefore, the trial court should not have allowed Dr. Martell to give his opinion as to whether the gun was placed or randomly dropped. Nevertheless, we conclude beyond a reasonable doubt that this error did not affect the jury verdict. *See DiGuilio*. Prior to Dr. Martell's testimony, the State had already presented the testimony of Deputy McDonald, who found the gun the day after the murder. Deputy McDonald testified that he believed that the gun was placed between the rocks and not dropped. This testimony was given without objection.

> After reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Holland's convictions of first-degree murder, armed robbery, attempted sexual battery, and attempted first-degree murder.

*Holland*, 773 So.2d at 1075-76.

The Court has reviewed the entire record, including Dr. Martell's testimony, and finds

that the Florida Supreme Court's conclusion that the error was harmless is not an unreasonable

application of federal law.[50] While the Court concurs that the admission of Dr. Martell's opinion

---

[50] Dr. Martell is a forensic psychologist. ([D.E. 125-56] at 26). Dr. Martell was accepted as an expert in the fields of psychology and neuropsychology. In large part, Dr. Martell testified as to his expert opinion regarding Mr. Holland's malingering and his ability to appreciate the nature and consequences of what he was doing. (*See id.*). However, Dr. Martell also testified to certain facts not in evidence. Mr. Holland's counsel objected; his objections were overruled. Dr. Martell's opinion about whether or not the gun Mr. Holland used to shoot Officer Winters was

testimony was clear error, the Court also recognizes that the United States Supreme Court has previously determined that "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman*, 386 U.S. at 22. The Florida Supreme Court determined that Mr. Holland's case was such a case. The Court, applying the deference required by the AEDPA to the decisions of the Florida Supreme Court, does not find that this determination was "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)(citing *Williams v. Taylor*, 529 U.S. 362 (2000)).

As to the single claim of error regarding Dr. Martell's opinion testimony, the Court finds that the Florida Supreme Court's determination was not an unreasonable application of clearly established federal law. Further, even if the Court conducted a plenary review of this claim, the result would be the same because while the Court finds error in the admission of the testimony, the Court does not find it resulted in actual prejudice. *See Vining*, 610 F.3d at 571. Officer McDonald, who was the person who actually found Officer Winters' gun after the shooting, testified at trial. ([D.E. 125-41] at 76-77). During his testimony, the State introduced into evidence the crime scene photos of the gun in the location about which Officer McDonald testified. (*Id.* at 77-80). Officer McDonald further testified, without objection, that he believed the gun was placed rather than dropped in the location it was found. (*Id.* at 83). At best, Dr.

---

randomly or intentionally placed on the ground was based on the crime scene photographs. During Dr. Martell's testimony, counsel for Mr. Holland again objected because "[a]nd this is the basis of my objection, Judge. That's his speculation. That's an issue for the jury to decide. He shouldn't be allowed to treat it as fact for purposes of basing an opinion." ([D.E. 125-57] at 16). The trial court overruled the objection. Following Dr. Martell's testimony, the State rested its case. (*Id.* at 62).

Martell's testimony repeated the testimony and photographic evidence properly before the jury. Therefore, Mr. Holland has not shown actual prejudice. Habeas relief as to this sub-claim is also denied.

## IV. INADMISSIBLE STATEMENTS

Mr. Holland's fourth claim for habeas relief is that his statements made to police were "involuntary and taken after he invoked his right to counsel." ([D.E. 117] at 52). During his initial trial, Mr. Holland moved to suppress certain statements made to law enforcement after his arrest. The trial court held an evidentiary hearing.

At the hearing, Officer Wesolowski testified that when he first came into contact with Mr. Holland, Mr. Holland identified himself as "Antonio Rivera." ([D.E. 125-1] at 15). At the time of his arrest, Mr. Holland spoke Spanish to the police officers. Therefore, the Pompano Beach police had one of its Spanish speaking officers, Officer Juan Cabrera, translate *Miranda*[51] warnings to Mr. Holland. At that time, Mr. Holland invoked his right to counsel and the interview ceased. (*Id.* at 17-18). Mr. Holland was transported to the jail. (*Id.* at 20). One week after his arrest and subsequent to the appointment of counsel, Officer Wesolowski went to the jail to obtain "background" information from Mr. Holland. At that time, Mr. Holland showed him his public defender's business card and the interview again ceased. (*Id.* at 28-29).

Next, Detective Kevin Butler testified. Detective Butler saw Mr. Holland in the booking area but did not speak to him until Mr. Holland had been transferred to the Pompano jail. (*Id.* at 32). Upon arrival at the jail, Detective Butler found Officer Cabrera outside of Mr. Holland's cell. Officer Cabrera's stated purpose was to "keep contact with him, eye contact with him in case he would say something, and basically, just - - you know, Juan is bilingual, and at this point,

---

[51] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Antonio, the name he had been given, he only spoke Spanish. So - -." (*Id.* at 33).  Detective

Butler spoke with Mr. Holland in an effort to obtain his correct identification.  After speaking

with him, Mr. Holland provided Detective Butler with his true identity.  (*Id.* at 35).  As Mr.

Holland had invoked his right to counsel, Detective Butler testified that he gave Mr. Holland his

business card and then left.

 At 2:30 a.m., Mr. Holland was again brought to booking to be photographed and

fingerprinted under his true identity.  (*Id.* at 36).  At some point during this booking, Mr. Holland

indicated that he wanted to speak with Detective Butler.  Detective Butler took Mr. Holland into

an interview room and again advised him of his *Miranda* rights.  Detective Butler read from a

*Miranda* waiver form and Mr. Holland responded regarding each of his constitutional rights.

The detective recorded Mr. Holland's responses on an affidavit and Mr. Holland signed the

document indicating that he was making a knowing waiver.  (*Id.* at 43).  Mr. Holland then made

inculpatory statements to the police.

 Mr. Holland first argued this claim on direct appeal. The Florida Supreme Court denied

the claim because it found no error.

> In issue seven, Holland asserts that the trial court abused its discretion in denying
> his motion to suppress his statements to the police. After Holland was arrested,
> the police obtained his name and his fingerprints. The police also attempted to
> interview Holland, but when he was initially read his *Miranda* rights, he invoked
> his right to counsel, and therefore the interview ceased. As the police began to
> process the case over the next couple of hours, they discovered that Holland had
> given a false name, for his fingerprints did not match the name he gave the police.
> Therefore, Detective Butler went to Holland's cell to ask him his real name. After
> Holland gave him his real name, Detective Butler presented his card to Holland
> and said, "[I]f you want to talk to me, you can call me." Later, Holland asked to
> talk to Detective Butler and subsequently discussed the details of the crime.
> Holland claims that Detective Butler undermined Holland's right to counsel by
> giving Holland his card and extending an invitation to talk.

In support of his claim, Holland relies on *Zeigler v. State*, 471 So.2d 172 (Fla. 1st DCA 1985). In *Zeigler,* the defendant invoked his right to counsel at the time of his arrest, and questioning ceased. However, while the defendant was being transported from Quincy to Jacksonville, a detective made the following statements to the defendant:

> I pulled up behind the Duval County Jail and told them [sic] him that this was the county jail, that if he wanted to make a statement or say anything he could at this time because there wasn't going to be no tomorrow, the ballgame was over, he was going to be booked in jail. And he made the return comment that—as I recall, you boys or you guys have been good to me, let's go to the office and I'll tell you what you want to know. And then we drove over underneath the Police Memorial Building and went to an interview room at the homicide division.

*Id.* at 174. The defendant subsequently gave a statement to the police. The trial court denied the defendant's motion to suppress the statement. On appeal, the district court reversed, finding that the detective's statement amounted to an interrogation which was not initiated by the defendant. *See id.*

We find the facts of *Zeigler* distinguishable from the present case. In *State v. Foster*, 562 So.2d 808, 810 (Fla. 5th DCA 1990), the Fifth District Court of Appeal made the following observations:

> The protective nature of *Miranda* warnings concerns investigative interrogation. We do not think *Miranda* applies to questions designed to obtain basic identifying data as routinely occurs at bookings or arraignments. *State v. McAdams*, 559 So.2d 601 (Fla. 5th DCA 1990); *Esposito v. Adams*, 700 F.Supp. 1470, 1479 (N.D.Ill.1988). *Miranda* warnings are not required outside the context of an inherently coercive custodial interrogation.

Similarly, in *Avila v. State*, 545 So.2d 450, 451 (Fla. 3d DCA 1989), the Third District Court of Appeal concluded that a question aimed at discovering the real name of a defendant is not an interrogation within the scope of *Miranda*.

The purpose of Detective Butler's contact with Holland was to ascertain his real name. In fact, Detective Butler specifically told Holland that he did not want to talk to him about the case because he had asked for an attorney and that the only reason he came to see Holland was to find out his real name. The record is clear that it was Holland, not Detective Butler, who initiated the conversation which ultimately resulted in the confession. Holland specifically asked Detective Butler,

"Can I talk to you?" After Detective Butler escorted Holland to the interview room, Detective Butler again informed Holland of his *Miranda* rights. Detective Butler specifically reminded Holland that he had previously asked for an attorney and clarified that Holland was willing to talk without an attorney present. Holland responded by saying, "I'll talk to you," and proceeded to sign the waiver of *Miranda* rights form. Based on the foregoing, we find no error.

*Holland*, 773 So.2d at 1073-75. Mr. Holland argues that this determination was "contrary to and/or an unreasonable application of Supreme Court law" and "habeas corpus relief is warranted." ([D.E. 117] at 52).

When making its determination, the Florida Supreme Court relied on state law. However, so long as neither the reasoning nor the result of the state-court decision contradicts clearly established federal law, habeas relief should be denied. Mr. Holland's direct appeal was denied on October 5, 2000 (rehearing denied December 20, 2000).[52]  At the time, clearly established federal law was such that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further *police-initiated* custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)(emphasis added). This is not in dispute. The precise question at issue here is when Detective Butler presented his card to Mr. Holland and said, "if you want to talk to me, you can call me" does that constitute a police-initiated custodial interrogation which would run afoul of *Edwards*. The Florida Supreme Court did not analyze this question but rather concluded that because Mr. Holland later initiated a conversation with the detective and then waived his *Miranda* rights, his subsequent exculpatory statements were

---

[52] Similar to Claim One, the State again relies on federal law which was decided well after the affirmance of Mr. Holland's conviction and sentence on direct appeal. (*See* [D.E. 120] at 61). The Court again rejects the State's arguments relying upon law which was not clearly established federal law at the time of Mr. Holland's direct appeal.

admissible.  The Court agrees.

It is undisputed that Mr. Holland made an invocation of his *Miranda* rights when he was initially arrested.  The police detectives investigating the case were aware of Mr. Holland's invocation of his rights.  Nonetheless, after Mr. Holland revealed his true identity to the investigating detective, he was given the detective's business card and was advised that if Mr. Holland wanted to speak with the detective to contact him. Mr. Holland later indicated that he wanted to speak the detective and made inculpatory statements. Mr. Holland argues that the actions of the police officers "were designed to undermine" his invocation of counsel.  (*See* [D.E. 117] at 55).  Even if that were true, there is no clearly established federal law which would determine that when Detective Butler provided Mr. Holland with his business card and told Mr. Holland to contact him if he wanted to talk, it constituted a police-initiated interrogation.

The United States Supreme Court first addressed the meaning of "interrogation" under *Miranda v. Arizona* in 1980.  *See Rhode Island v. Innis*, 446 U.S. 291 (1980).  The Supreme Court concluded that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 301.  Even if the Court were to decide that Detective Butler was engaging in subtle compulsion when he handed Mr. Holland his business card, the Court would also have to find that Mr. Holland's "incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 303.  The record does not indicate that Detective Butler had any reason to believe that giving Mr. Holland his card would elicit the inculpatory statements Mr. Holland subsequently made.  While the detective may have been hopeful that such a response would occur, there is a difference between

hopeful thinking and being reasonably likely.  *Id.* at 303. This is particularly true because Mr. Holland had previously invoked his right to remain silent and his right to counsel on several prior occasions.  Thereafter, Mr. Holland requested to speak with the detective. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. Arizona*, 384 U.S. at 439.  Accordingly, the Florida Supreme Court's disposition of this claim was not an unreasonable application of clearly established federal law and habeas relief must be denied.

### V. INSUFFICIENT EVIDENCE OF PREMEDITATION

In his fifth claim for habeas relief, Mr. Holland asserts that "insufficient evidence exits to support premeditation." ([D.E. 117] at 59).  Premeditation is the essential element which distinguishes first-degree murder from second-degree murder.  After the close of the State's case, Mr. Holland made motions for a judgment of acquittal. ([D.E. 125-41] at 99).  Counsel argued that the State had not put forth a "scintilla of evidence" as to the issue of premeditation.  (*Id.*). The State countered that the testimony of Abraham Bell established premeditation because he witnessed Mr. Holland "yank [the gun] from the holster and he fired right into [Officer Winter's] body." ([D.E. 125-41] at 101).   The Court denied the motion having found that the State had presented evidence of a prima facie case.  (*Id.* at 103).   At the close of the defense case, Mr. Holland renewed the previous motion for judgment of acquittal. (*See* [D.E. 125-51] at 53). The motion was again denied.  Following the State's rebuttal, the defense again renewed the motion for judgment of acquittal. ([D.E. 125-59] at 24).  The motion was again denied.  Mr. Holland asserted this claim on direct appeal of his conviction and sentence.  The Florida Supreme Court rejected the argument finding that:

In issue nine, Holland claims that the trial court abused its discretion in denying Holland's motion for judgment of acquittal as to the premeditation element of first-degree murder. "[A] motion for judgment of acquittal should not be granted unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." *Davis v. State*, 703 So.2d 1055, 1059 (Fla.1997). Holland points out that witness Dorothy Horne testified that neither Officer Winters nor Holland had control over the gun. However, witness Betty Bouie testified that Holland took the gun from Officer Winters and shot him. Witness Nikki Horne testified that she saw a police officer and a man struggling and "the man took the policeman's gun from the side and the gun went off three times." Witness Parish Horne testified that he saw Holland reach around the officer and take the gun from the officer's holster and then shoot the officer. Finally, witness Abraham Bell testified that during the struggle, he saw Holland repeatedly try to grab the officer's gun, and when he finally freed the gun from the holster, Holland shot the officer twice and then ran. Based on all of this testimony, the trial court did not err in denying the motion.

*Holland*, 773 So.2d at 1074-75. The Court has reviewed the record. This is an accurate summary of the testimony.

In *Jackson v. Virginia*, the Supreme Court held that a state prisoner's claim that the evidence in support of his conviction was insufficient to have led a rational trier of fact to find him guilty beyond a reasonable doubt constitutes a federal constitutional claim that is cognizable in a federal habeas proceeding. 443 U.S. 307, 321 (1979) (internal citations omitted). The Florida Supreme Court reviewed the testimony presented at Mr. Holland's re-trial and determined that, based on the evidence, the trial court did not err in denying the motion. The Court must presume a state court's factual findings are correct, and the petitioner can rebut them only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). For Mr. Holland to be granted habeas relief, "[n]ot only must the factual determination have been unreasonable, but the state court's factual findings must be shown unreasonable by clear and convincing evidence." *Callahan v. Campbell*, 427 F.3d 897, 926 (11th Cir. 2005). The burden is on Mr. Holland to

establish that the factual findings are unreasonable. *See* 28 U.S.C. § 2254(e)(1).  Mr. Holland has

not done so.

> The purpose of a motion for judgment of acquittal is to test the legal sufficiency of
> the evidence presented by the [S]tate." *Harris v. State*, 954 So.2d 1260, 1261
> (Fla.Dist.Ct.App.2007). The Florida Supreme Court has held that there is
> "sufficient evidence to sustain a conviction if, after viewing the evidence in the
> light most favorable to the State, a rational trier of fact could find the existence of
> the elements of the crime beyond a reasonable doubt." *Baugh v. State*, 961 So.2d
> 198, 204 (Fla.2007).

*McKinzie v. Sec'y, Dep't. of Corr.*, 265 Fed. Appx. 858, 859 (11th Cir. 2008).  In Florida,

premeditation is more than a mere intent to kill; it is a fully formed conscious purpose to kill.

This purpose to kill may be formed a moment before the act but must exist for a sufficient length

of time to permit reflection as to the nature of the act to be committed and the probable result of

that act.  *Sireci v. State*, 399 So.2d 964, 967 (Fla.1981)(*overruled on other grounds*).  Whether or

not the evidence shows a premeditated design to commit a murder is a question of fact for the

jury which may be established by circumstantial evidence.  *Preston v. State*, 444 So.2d 939, 944

(Fla.1984)(*overruled on other grounds*).

   While there may have been conflicting testimony regarding the struggle for Officer

Winter's weapon, the State's witnesses testified to facts inconsistent with Mr. Holland's

hypothesis of events.  This was enough for the denial of the motion for judgment of acquittal.

The State need not "'rebut conclusively every possible variation' of events, but need only

'introduce competent evidence which is inconsistent with the defendant's theory of defense.'"

*Washington v. State*, 737 So.2d 1208, 1215 (Fla. 1st DCA 1999)(*quoting State v. Law*, 559 So.2d

187, 189 (Fla.1989)).  The Court accords great deference to a state court's interpretation of State

law.  *Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir.1996) (federal courts entertaining petitions for

writs of habeas corpus must follow the state court's interpretation of a state law absent a constitutional violation).  Because the State introduced competent evidence which is inconsistent with Mr. Holland's theory of defense, and Mr. Holland has not shown that the Florida Supreme Court erroneously applied clearly established federal law or unreasonably interpreted the facts, habeas relief is denied.

### VI. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his sixth claim for relief, Mr. Holland asserts that his "appellate counsel rendered prejudicially deficient performance in violation of the Sixth Amendment."  ([D.E. 117] at 63).  Mr. Holland argues two areas of deficiency.  First, Mr. Holland argues that his appellate counsel failed to challenge the trial court's exclusion of reference to Internal Affairs records. ([D.E. 117] at 66).  Second, Mr. Holland contends that his appellate counsel failed to raise the trial court's improper denial of additional peremptory challenges.  ([D.E. 117] at 74).  Mr. Holland first argued these claims in his state petition for writ of habeas corpus.  As to the first alleged deficiency, the Florida Supreme Court denied relief as follows:

> Holland argues that his appellate counsel was ineffective for not challenging the trial court's decision to preclude him from referencing internal police documents, which allegedly described incidences when Officer Winters used excessive force. Holland contends that had evidence of Officer Winters' (alleged) habitual use of excessive force, poor judgment, and racial confrontation been revealed to Holland's jury, the evidence would have supported a finding that Officer Winters' excessive use of force precipitated the struggle. These internal police records were not admissible; therefore, appellate counsel cannot be deemed deficient for failing to raise this issue.
>
> As a general rule, evidence of a victim's character is inadmissible to prove action in conformity with it on a particular occasion. § 90.404(1), Fla. Stat. (2004). However, when a claim of self-defense is raised, a defendant may introduce evidence of a victim's character to establish who the aggressor was, or that the defendant was apprehensive of the victim at the time of the homicide. *Williams v.*

*State*, 252 So.2d 243, 246 (Fla. 4th DCA 1971). However, before a defendant may introduce evidence of the victim's character, he must first show that there was an "overt act by the [victim] at or about the time of the [incident] that reasonably indicated a need for [self-defense]." *Quintana v. State*, 452 So.2d 98, 100 (Fla. 1st DCA 1984) (*quoting Williams*, 252 So.2d at 247). Holland failed to establish this prerequisite. The trial record does not support his claim that Officer Winters committed an overt act that would have caused Holland to act in self-defense. In fact, the record evidence of undisputed eyewitness testimony is that Officer Winters did not commit an overt act.

Regardless, even if Holland were able to show an overt act by Officer Winters, the police records would still be inadmissible. The internal affairs records only show prior, specific acts. Because there is no indication Holland was aware of these prior acts at the time of the homicide, these records were inadmissible. *See Smith v. State*, 606 So.2d 641, 643 (Fla. 1st DCA 1992) (recognizing that when character evidence is offered to prove the reasonableness of the defendant's apprehension, prior knowledge of the specific acts of violence is necessary).

Because the internal affairs records are inadmissible, Holland has failed to show deficient performance under *Strickland*. Even assuming that appellate counsel was deficient for not raising the issue on direct appeal, Holland would still not be able to establish prejudice under *Strickland*. Holland was convicted of attempting to commit a forcible felony. Because the defense of self-defense is legally unavailable to a person who is attempting to commit, committing, or escaping from the commission of a forcible felony, Holland was not prejudiced and this claim is without merit. *See Marshall v. State*, 604 So.2d 799, 803 (Fla.1992); § 776.041, Fla. Stat. (1989).

*Holland*, 916 So.2d at 760 (footnotes omitted).

In order for Mr. Holland to prevail on his claims, he "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 787. Mr. Holland has not done so.

89

*The Strickland Standard*[53]

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the two-prong test that a convicted defendant must meet to demonstrate that his or her counsel rendered ineffective assistance.  First, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  Second, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The Court defines a "reasonable probability" as one "sufficient to undermine confidence in the outcome."  *Id.*  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.  With this two prong test in place and the AEDPA deference applied to decisions of state courts by federal habeas courts, the Court reviews Mr. Holland's ineffective assistance of counsel claims.

**i. Failure to challenge the trial court's exclusion of references to Internal Affairs records.**

In advance of the re-trial, the State of Florida filed a motion in limine to exclude any

---

[53] Claims of ineffective assistance of appellate counsel are governed by the standard articulated in *Philmore v. McNeil*:

> In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." *Id.* at 1130-31. Rather, an effective attorney will weed out weaker arguments, even though they may have merit. *See id.* at 1131. In order to establish prejudice, we must first review the merits of the omitted claim. *See id.* at 1132. Counsel's performance will be deemed prejudicial if we find that "the neglected claim would have a reasonable probability of success on appeal." *Id.*

575 F.3d 1251, 1264-65 (11th Cir. 2009).

reference to the internal affairs records of Officer Winters. ([D.E. 125-17] at 27).  Defense

counsel argued that the records were admissible because "a potential defense in this case [is] that

the actions that occurred out there were as a result of excessive force used by the officer." ([D.E.

125-17] at 28).   The trial court granted the motion finding that even if the internal affairs records

showed that Officer Winters previously used force, "it is not probative of any conduct of Officer

Winters in this particular instance." (*Id.*).  At trial, Mr. Holland was precluded from admitting

the internal affairs records of Officer Winters.  On direct appeal of his conviction and sentence,

appellate counsel did not argue that the trial court committed error when it granted the State's

motion.  Now, Mr. Holland contends that his appellate counsel was ineffective when he failed to

raise this error on direct appeal.

　　　　At the heart of this claim is an issue of state law. §90.404(1) FLA. STAT. (2004).  Whether

or not Officer Winter's internal affairs records were admissible evidence at trial is best

interpreted by the highest state court.  Interpretation of Florida law by Florida courts is binding

on a federal court deciding a petition for writ of habeas corpus.  *See Estelle v. McGuire*, 502 U.S.

62, 67-68 (1991) (reaffirming principle that a state court's interpretation of state law, including

one announced on direct appeal of the challenged conviction, must be followed by federal

courts).  If Mr. Holland does not show that his appellate counsel should have raised this claim

because it was a meritorious claim under Florida law, he cannot prevail.  He must show that

counsel's performance was deficient as required under the first prong of *Strickland* because his

appellate counsel cannot be deemed ineffective for failing to raise a non-meritorious claim. *See*

*Jones v. Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006)(finding it *fortiori* that appellate counsel

was not ineffective for failing to raise an issue on appeal when the trial counsel's inactions were

not deemed ineffective assistance of counsel for initially failing to object).

Here, the Florida Supreme Court reviewed the claim pursuant to state law and determined that "before a defendant may introduce evidence of the victim's character, he must first show that there was an 'overt act by the [victim] at or about the time of the [incident] that reasonably indicated a need for [self-defense].'" *Holland*, 916 So.2d at 760.  Mr. Holland did not meet that threshold.  Therefore, the State's motion was properly granted.  *Id.*  Mr. Holland urges that the Florida Supreme Court's interpretation of the facts was unreasonable because the "actual facts" establish that Officer Winters "threaten[ed] to put the dog on Albert Holland, put[] his nightstick in his back despite initial compliance, put[] him in a headlock, t[ook] him to the ground, beat[] him in the back repeatedly with a nightstick and engaging in the final struggle, in which both men had their hands on the gun as it left the holster, comprised overt acts by the victim that may have reasonably prompted Holland to act in what he believed to be self-defense to avoid being injured or killed by a dog, a nightstick and a firearm." ([D.E. 117] at 72).

Presuming factual determinations made by state courts are correct, Mr. Holland has not met his burden of rebutting the presumption of correctness by clear and convincing evidence. Moreover, the Florida Supreme Court reached an alternate basis for the denial of this claim. "Regardless, even if Holland were able to show an overt act by Officer Winters, the police records would still be inadmissible. The internal affairs records only show prior, specific acts. Because there is no indication Holland was aware of these prior acts at the time of the homicide, these records were inadmissible." *Holland*, 916 So.2d at 761.  In support of this determination, the court cited Florida law which recognized "that when character evidence is offered to prove the reasonableness of the defendant's apprehension, prior knowledge of the specific acts of

violence is necessary." *Id.* As this was the law in Florida at the time of Mr. Holland's direct

appeal, it was not deficient performance for Mr. Holland's appellate counsel to not raise this

claim, as it would have been without merit. Habeas relief as to this sub-claim is denied.[54]

### ii. Improper denial of a cause challenge and additional peremptory challenges.

Mr. Holland also argues that his appellate counsel was ineffective for failing to raise an

improper denial of a cause challenge and additional peremptory challenges by the trial court.[55]

As to the cause challenge, Mr. Holland contends that the trial court erroneously refused to

---

[54] The Florida Supreme Court also determined that Mr. Holland could not show prejudice because Mr. Holland "was convicted of attempting to commit a forcible felony. The defense of self-defense is legally unavailable to a person who is attempting to commit, committing, or escaping from the commission of a forcible felony." *Id.* (footnotes omitted). Therefore, even if Mr. Holland's appellate counsel's performance was deficient, Mr. Holland has not shown that he was prejudiced. Without satisfying the second prong of the *Strickland* standard, habeas relief must be denied.

[55] Mr. Holland also argues that his appellate counsel was ineffective for failing to assert a challenge on direct appeal for the trial court's refusal to grant additional peremptory challenges. The Court reviewed the opinion of the Florida Supreme Court on this issue and does not find that it was "either contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). As the Florida Supreme Court properly noted, additional peremptory challenges are well within the discretion of the trial court. Therefore, appellate counsel's performance was not deficient for failing to raise this issue on direct appeal. While this claim is brought before the Court as a *Strickland* claim, it is noteworthy that the United States Supreme Court has "'long recognized' that 'peremptory challenges are not of federal constitutional dimension.'" *Rivera v. Illinois*, 129 S.Ct. 1446 (2009) (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000)). "States may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.'" *Id.* at 1450 (quoting *Georgia v. McCollum*, 505 U.S. 42, 57 (1992)). As such, the Court does not find that appellate counsel was deficient for failing to raise an issue on direct appeal which the Court could not have ultimately granted habeas relief in any event because it is not a federal constitutional issue and the state court has determined that pursuant to common law and the Florida Rules of Criminal Procedure that the trial judge was well within his discretion. As to this sub-claim, habeas relief is also denied.

remove for cause a racially biased juror, Keith Mulford. ([D.E. 117] at 74). Mr. Holland first

raised this claim in his state petition for writ of habeas corpus.  The Florida Supreme Court

denied his petition as to this claim as follows:

> Holland also claims his appellate counsel was ineffective for failing to challenge
> the trial court's denial of a cause challenge to a juror based on the juror's racial
> prejudice and for denial of adequate peremptory challenges. We deny this
> argument because Holland has failed to establish that his counsel acted deficiently
> or that this deficiency prejudiced him.
>
> Holland has failed to establish that his appellate counsel acted deficiently because
> the argument he claims counsel should have made is without merit. "It is well
> settled that the trial judge has discretion to grant or deny additional peremptory
> challenges." *Parker v. State*, 456 So.2d 436, 442 (Fla.1984); *see* Fla. R.Crim. P.
> 3.350(e). In Holland's case, the trial judge used his discretion to initially grant
> both sides twelve peremptory challenges-two more than the statutory requirement.
> He later granted each side two more peremptory challenges. The trial judge also
> dismissed the challenged venire member for cause. Therefore, not only is Holland
> unable to establish that the trial court abused its discretion, but he also is unable to
> point to any objectionable juror who served. He has not established error. *See
> Trotter v. State*, 576 So.2d 691, 693 (Fla.1990) (requiring a defendant to identify a
> specific juror who "actually sat on the jury and whom the defendant either
> challenged for cause or attempted to challenge peremptorily or otherwise objected
> to after his peremptory challenges had been exhausted"); *see also Busby v. State*,
> 894 So.2d 88, 96-97 (Fla. 2004) (requiring a defendant to "show that an
> objectionable juror has served on the jury" before finding a defendant was
> prejudiced by the trial court's decision not to authorize an additional peremptory
> challenge), *cert. denied*, 545 U.S. 1150, 125 S.Ct. 2976, 162 L.Ed.2d 906 (2005).

*Holland*, 916 So.2d at 762.  Here, Mr. Holland's claim suffers from many infirmities.

First, this claim is so attenuated that it is difficult to follow.  Asserting that he has a

constitutional right to an impartial jury, Mr. Holland devotes a great deal of argument to how Mr.

Mulford was racially biased and should not have been on his jury.  However, Mr. Mulford did

*not* actually serve a juror in Mr. Holland's case.[56]  It appears that Mr. Holland's real argument is

---

[56] After the jury was seated the trial judge excused Mr. Mulford because he was "not of
the character and nature" to serve on the jury based on his renewed complaints that he could not

that because the trial court refused to excuse Mr. Mulford for cause until after Mr. Holland had

"expended all of his peremptory challenges, until after he was refused additional peremptories

and until after the original alternates had already been selected" caused the trial judge to

improperly deny the peremptory challenges needed by Mr. Holland to "ensure he was tried by a

jury of his peers." ([D.E. 117] at 81). Mr. Holland argues that because only one juror was

African-American that his jury was not made up of his peers. (*See id.*)

Second, Mr. Holland has failed to cite any clearly established federal law in support of his

specific claim.[57] Rather, Mr. Holland argues that the Florida Supreme Court's decision is

contrary to the actual facts and record in his case. (*Id.*). This is simply not so. The only juror to

which Mr. Holland now argues was selected and seated in error did not actually serve on the jury.

Therefore, when the Florida Supreme Court determined that Mr. Holland was "unable to point to

any objectionable juror who s*erved,*" that is true. *Holland*, 916 So.2d at 762 (emphasis added).

In truth, Mr. Holland's argument is not really that an objectionable juror served but rather

that because an objectionable juror was selected and seated *and* because Mr. Holland did not

have any additional peremptory challenges, this resulted in his jury only having one African-

American juror, which resulted in him not being tried by a jury of his peers. Even if this were

true, it is not unconstitutional. *See Taylor v. Louisiana*, 419 U.S. 522, 702 (1975)("It should also

---

financially afford to serve on a jury and his potential to harbor resentment against Mr. Holland
due to his race. ([D.E. 125-29] at 22).

[57] Mr. Holland does cite *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988), *Morgan v. Illinois*,
504 U.S. 719 (1992) and *Irvin v. Dowd*, 366 U.S. 717 (1961) for the general principle that a
defendant on trial for his life is guaranteed the right to an impartial jury. These three citations do
nothing more than recite a commonly understood constitutional guarantee. Indeed, Mr. Holland
does not apply these cases to argue how the Florida Supreme Court's decision was an
unreasonable application of clearly established law.

be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.").

To make the argument even further removed, Mr. Holland's actual claim for a writ of habeas corpus is that his appellate counsel was ineffective for failing to raise the above referenced claim on direct appeal.  As the underlying claim lacks merit, appellate counsel cannot be deficient for failing to raise it.  *See Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 915 (11th Cir. 2009).  Further, Mr. Holland has far from alleged, let alone established how his appellate counsel's failure to argue this claim on direct appeal prejudiced him.  This is fatal to his claim. *See Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th Cir. 2011)(citing *Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004); *see also Clark v. Crosby*, 335 F.3d 1303, 1312 n. 9 (11th Cir. 2003) The prejudice prong of the *Strickland* test is whether there was a reasonable probability that had appellate counsel not been deficient, the appellate court would have granted the petitioner a new trial.  As such, habeas relief is denied.

## VII. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Mr. Holland's seventh claim for habeas relief is that his Sixth Amendment right to counsel was violated when his court appointed counsel provided deficient performance which prejudiced him.  (*See* [D.E. 117] at 82).  Mr. Holland asserts three specific areas of deficiency with multiple sub-claims.  *Id.*  First, Mr. Holland argues that his counsel was ineffective for making an unreasonable concession of guilt during closing arguments.  (*Id.* at 82).  Second, Mr. Holland contends that his counsel failed to object to police testimony that the firearm used to murder Officer Winters had been intentionally hidden.  (*Id.* at 85).  Finally, Mr. Holland argues

that his counsel failed to object during closing argument when the prosecutor "repeatedly misstated the evidence, argued matters not in evidence, improperly shifted the burden of proof, improperly vouched for the credibility of State witnesses, expressed personal belief in the Petitioner's guilt, attacked and ridiculed the defense, engaged in inflammatory argument, accused the defense of denigrating witnesses, and commented on petitioner's post-arrest silence." (*Id.* at 87-88).   Mr. Holland first raised these and other postconviction claims in his Rule 3.851 motion. On January 6, 2003, the trial court held a *Huff* hearing.[58] ([D.E. 125-106] at 102).   At that hearing, counsel for Mr. Holland advised the trial court that only two of Mr. Holland's postconviction claims "require[d] an evidentiary hearing."   However, before the trial court ruled, the hearing was continued because counsel for Mr. Holland had failed to comply with Rule 3.851(a) & (e).  *Id.* at 113.  After the trial court granted Mr. Holland leave to comply with the rule, the *Huff* hearing reconvened and the court granted Mr. Holland's request for an evidentiary hearing.  On April 10, 2003, the trial court held an evidentiary hearing on Mr. Holland's claim that his trial counsel was ineffective for conceding his guilt to attempted first degree murder.[59] ([D.E. 125-107] at 13).  The trial court did not conduct an evidentiary hearing on Mr. Holland's remaining claims for postconviction relief.  Ultimately, the trial court denied this claim and all of Mr. Holland's remaining claims for postconviction relief.  Mr. Holland appealed to the Florida

---

[58] *See Huff v. State*, 622 So.2d 982 (Fla. 1993) (holding that "[b]ecause of the severity of punishment at issue in a death penalty postconviction case" a judge must allow the attorneys on an initial 3.850 motion to appear before the court "for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion.").

[59] Mr. Holland was also granted a hearing on his claim that his penalty phase counsel was ineffective for failing to adequately investigate mitigation evidence.  Mr. Holland has abandoned that claim here.

Supreme Court which denied him relief.  The Court reviews the decision of the Florida Supreme

Court with the highest deference circumscribed by the AEDPA.

### A.  Concession of Guilt.

During closing arguments, counsel for Mr. Holland made the following argument:

> Is he guilty of attempted first degree murder of Thelma Johnson? By his own
> admission, yes. Yes. So if you're not going to believe that, in fact, he was legally
> insane at the time of the commission of that offense, then the defendant offers no
> defense to that.

([D.E. 125-60] at 65-66).  This statement is what Mr. Holland argues was the ineffective

assistance of counsel.  At the evidentiary hearing, trial counsel, James Lewis testified about his

closing argument wherein he conceded to the jury that Mr. Holland attempted to kill Thelma

Johnson.  ([D.E. 125-107] at 101).  Mr. Lewis testified that he did not consult with Mr. Holland

about the closing argument because by the time trial began, Mr. Holland had refused to see or

speak to Mr. Lewis.  ([D.E. 125-107] at 99).  Mr. Lewis testified that he did not view his closing

statement as a concession of guilt because the defense was insanity and if you were insane at the

time of the crime you are legally not guilty.  (*See* [D.E. 125-107] at 110).  Mr. Lewis believed that

this admission "brought some credibility as to the insanity defense."  (*Id.*).  Mr. Lewis felt he had

no other choice based on Mr. Holland's direct testimony when he took the stand in his own

defense during the re-trial.  (*Id.* at 113).  The Florida Supreme Court denied this claim as follows:

> Applying this standard to Holland's case shows that his argument is without
> merit. Defense counsel did not simply concede Holland's guilt. Instead, during
> closing argument, defense counsel acknowledged Holland's damaging trial
> testimony in which Holland effectively admitted each element of the crime, and
> counsel argued that Holland was not guilty by reason of insanity. Additionally,
> Holland's trial testimony was basically consistent with significant, damaging
> testimony from the victim and two eyewitnesses. Under the unique facts of this
> case, we conclude that defense counsel's "assistance was reasonable considering

all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

*Holland*, 916 So.2d at 755-56 (footnote omitted).

In order for the jury to convict Mr. Holland of the attempted first degree murder of Ms. Johnston, it would have to find that Mr. Holland acted "with a premeditated design to effect the death of Thelma Smith Johnson." ([D.E. 125-63] at 21). In Florida, a premeditated design to kill meant "that there was a conscious decision to kill. The decision must be present in mind at the time the act was committed." (*Id.* at 21). The trial court also instructed the jury on eleven lesser included offenses relating to the assault on Thelma Johnson. (*Id.*). Nonetheless, counsel for Mr. Holland clearly stated on the record that if the jury rejected Mr. Holland's insanity defense then Mr. Holland was guilty of attempted first degree murder. This concession of guilt sabotaged any hope that the jury would consider convicting Mr. Holland of any of the lesser included offenses. On this record, the performance of Mr. Holland's counsel was arguably deficient.

However, the Court need not conclusively resolve this question because, as determined below, Mr. Holland has failed to satisfy *Strickland*'s prejudice prong. *See Hall v. Head*, 310 F.3d 683, 699 (11th Cir. 2002) ( "[A]lthough there is evidence in the record to support the district court's finding of deficient performance, we need not and do not 'reach the performance prong of the ineffective assistance test [because we are] convinced that the prejudice prong cannot be satisfied.'"). To show prejudice, Mr. Evans would need to establish that his counsel's conduct rendered his trial "fundamentally unfair" or that "there is a reasonable probability that, but for counsel's unprofessional errors that the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Specifically, Mr. Holland argues that that because the trial court used the attempted murder conviction as an aggravating circumstance that he was

prejudiced.  (*See* [D.E. 117] at 85).  This argument is unpersuasive.  At sentencing, the trial court

found that the State established three aggravating factors beyond a reasonable doubt and only two

non-statutory mitigating circumstances to which the trial court gave "little weight."  Therefore,

the Court does not find that even if counsel had not conceded Mr. Holland's guilt to attempted

first degree murder in his closing argument,[60] that there is a reasonable probability that the result

of the proceedings would have been different.  Habeas relief is denied.

### B.  Failure to Object to Police Testimony.

Mr. Holland also asserts that his counsel was ineffective for failing to object to the

opinion testimony of a police officer that Mr. Holland had hidden rather than dropped the gun

used to kill Officer Winters.  (*See* [D.E. 117] at 85).  The Florida Supreme Court denied this

claim stating:

> In claim I, Holland alleges that his trial counsel was ineffective for failing to
> object to the admission of Officer McDonald's opinion testimony that Officer
> Winters' service weapon had been intentionally hidden in the place where it was
> found. Counsel's performance was not deficient in this regard. Officer
> McDonald's lay witness opinion testimony is analogous to testimony this Court
> held admissible in *Floyd v. State*, 569 So.2d 1225, 1231-32 (Fla.1990). In *Floyd*,
> this Court found that it was within the permissible range of lay observation and
> ordinary police experience for an officer to testify that a Kleenex box lying near
> the victim's body "appeared to have been knocked off the dresser." *Id.* at 1231.
> Similarly, in this case, Officer McDonald testified that a gun lying on the floor
> "appeared dropped" because it was lying in a "crevice" in the ground. This clearly
> falls within the permissible range of lay observation and ordinary police
> experience. *See Floyd*, 569 So.2d at 1232; § 90.701, Fla. Stat. (2004). Therefore,
> defense counsel's performance cannot be deemed deficient for failing to object to
> this testimony.

---

[60] Mr. Holland's argument is likewise flawed in that it presumes that the jury could not
have found him guilty of attempted first degree murder had his counsel not conceded his guilt.
This is simply not so. Given the testimony at trial, the jury certainly could have come to that
conclusion all on its own.

*Holland*, 916 So.2d at 758.

The Court has reviewed the testimony of Officer McDonald. (*See* [D.E. 125-41] at 74-96).  Officer McDonald was a police officer with the City of Pompano Beach.  He was part of a group of fifty to a hundred people who were conducting a search for Officer Scott Winter's service weapon. (*Id.* at 75).  Officer McDonald testified that he located Officer Winter's gun during that search.  In describing the location of the gun when he found it and in response to the direct question from the prosecutor, Officer McDonald testified that the gun "didn't appear it was dropped.  It actually was like a little cave, a crevice that you had to bend down and look and had to reach in to touch the gun." (*Id.* at 76-77).  It is this statement that Mr. Holland argues should have been objected to by his counsel.

However, Mr. Holland neglects to mention in his habeas petition that while his trial counsel did not object, he did extensively cross-examine Officer McDonald on this very issue. (*Id.* at 83-84).  In fact, the officer's opinion regarding the location of the gun was the subject of defense counsel's entire cross-examination.  As this claim is of ineffective assistance of trial counsel, Mr. Holland must show that his counsel's performance was deficient and this resulted in prejudice. To prevail on a claim of ineffective assistance, a petitioner must demonstrate both that his attorney's efforts fell below constitutional standards, and that he suffered prejudice as a result. *See Strickland v. Washington*, 466 U.S. 668 (1984).  Mr. Holland has shown neither.

Here, the Florida Supreme Court determined that counsel's performance was not deficient because Officer McDonald's testimony fell "within the permissible range of lay observation and ordinary police experience." *Holland*, 916 So.2d at 758.  Therefore, counsel cannot "be deemed deficient for failing to object to this testimony." *Id.*  This was not an unreasonable application of

101

clearly established federal law.  Moreover, Mr. Holland has not argued otherwise. (*See* [D.E. 117] at 85-87).  Mr. Holland argues a "reasonable probability of a different outcome" without establishing a deficiency or citing any established federal law in support of his arguments. Without having met the threshold requirements established by the AEDPA, habeas relief cannot be granted.

### C. Failure to Object to Prosecutorial Closing Argument.

Mr. Holland's final sub-claim is that his counsel was ineffective for failing to object during the prosecution's closing argument. ([D.E. 117] at 87).  He argues six specific objectionable areas.[61]  Mr. Holland contends that the prosecutor misstated the evidence, made a statement regarding his personal belief in Mr. Holland's guilt, improperly shifted the burden, improperly attacked Mr. Holland and discredited the defense, improperly vouched for the credibility of the State's witnesses and made comments on Mr. Holland's post-arrest silence. (*Id.*).  The trial court summarily denied this claim and adopted and incorporated the State's response.  On appeal to the Florida Supreme Court, Mr. Holland did not argue the *merits* of the individual sub-claims but rather argued that the trial court erred in summarily denying all his claims because "they are facially sufficient and not conclusively refuted by the record." ([D.E. 125-109] at 3).  The Florida Supreme Court found this argument without merit.

> In claim II, Holland alleges that his trial counsel was ineffective for failing to object to ten comments made by the State during its guilt phase closing argument.FN7 The trial court found that the issues raised in this claim were refuted by the record. In support of this finding, the court adopted and incorporated by reference the reasoning from the State's 3.851 response. We affirm. Holland has failed to show that defense counsel's failure to object was

---

[61]  In his Rule 3.850 postconviction motion, Mr. Holland argued ten specific objectionable comments but has abandoned four of those comments here.

> deficient performance or that if defense counsel had objected and the objection had been sustained, there is a reasonable probability that the trial court would have declared a mistrial. *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Therefore, the trial court did not err in summarily denying this claim.

*Holland*, 916 So.2d at 758-59 (footnote omitted).

The Court has reviewed the pleadings filed with the Florida Supreme Court and finds that Mr. Holland's claim is barred from federal habeas review.[62] When Mr. Holland argued this claim to the Florida Supreme Court, he did not argue it as the denial of any federally protected constitutional right. (*See* [D.E. 125-109] at 3-8). Rather, Mr. Holland argued that because the trial court "failed to attach record portions showing conclusively that Holland is entitled to no relief . . ., this Court should reverse summary denial of these claims and remand for further proceedings." (*Id.* at 8). This is a state procedural issue regarding the summary denial of postconviction claims by the trial court not a substantive constitutional claim. *See* FLA. R. CRIM. P. 3.850(d) & (f)(5)(D). Mr. Holland did not present his claim on the merits to the Florida Supreme Court; rather, he argued that his claims were either facially valid or not conclusively refuted by the record such that they should not have been summarily dismissed by the trial court. The Florida Supreme Court disagreed. Accordingly, Mr. Holland's current claim for federal habeas relief was not addressed on its merit in state court. Therefore, it is unexhausted and procedurally barred from further review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *see also* Order at 10-12. "When a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates

---

[62] This is not to suggest that this claim otherwise has merit. The Court believes that any prejudice argument asserted by Mr. Holland would have been extremely unlikely to have prevailed here.

the State's ability to honor his constitutional rights." *Cone v. Bell*, 129 S.Ct. 1769, 1780

(2009)(internal citations omitted).  Habeas relief cannot be granted.

## VIII. NON-STATUTORY MITIGATION

Mr. Holland's final claim for habeas relief is that "the trial court failed to consider certain

non-statutory mitigating circumstances that were supported by the evidence." ([D.E. 117] at 95).

Mr. Holland asserts that the trial court failed to consider five non-statutory mitigating

circumstances that are apparent from the face of the record.  Mr. Holland argues that this violates

the Eighth Amendment to the United States Constitution.  When Mr. Holland argued this claim

to the Florida Supreme Court, the supreme court found that "[b]ecause Holland failed to identify

the mitigators in question, the trial court did not err in failing to specifically address them.

Further, a review of the sentencing order reveals that most, if not all, of these proposed mitigators

were considered by the trial court." *Holland*, 773 So.2d at 1077.  The Court presumes these

factual determinations made by the state court are correct; and, Mr. Holland must rebut that

presumption by clear and convincing evidence. *See Hunter v. Sec'y, Dept. of Corr.*, 395 F.3d

1196, 1200 (11th Cir. 2005).  Based on the record reviewed by the Court, including but not

limited to, the transcripts from the *Spencer* hearing, the Sentencing Memorandum filed by both

parties and the trial court's Sentencing Order, Mr. Holland has not done so.   (*See* [D.E. 125-82]

at 103-06, [125-83] at 4-28, [D.E. 125-83] at 69-73 & [D.E. 125-84] at 1-22).

As an initial matter, it is true that "that the Eighth and Fourteenth Amendments require

that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a

defendant's character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110

104

(1982). In the Defendant's Sentencing Memorandum, Mr. Holland argued to the trial court that he had established "several non-statutory mitigating circumstances." ([D.E. 125-82] at 103). Mr. Holland supplied the trial court with a precise list of the four non-statutory mitigating factors for the trial court to consider. They were as follows: 1) a history of drug and alcohol abuse; 2) a long standing history of mental illness; 3) organic brain damage due to severe beating received while in prison; and 4) two previous adjudication's [sic] of insanity, in the Superior Court of the District of Columbia. ([D.E. 125-82] at 103).

The five non-statutory mitigating circumstances that Mr. Holland's now argues were not considered by the trial court are: 1) the homicide occurred with little or no premeditation; 2) Mr. Holland's drug use at the time of the offense; 3) the traumatic effect of Mr. Holland having been nearly beaten to death; 4) Mr. Holland's positive childhood activities and loving family relationships prior to drug addiction; and 5) Mr. Holland may have been suffering from a mental and emotional disturbance less than the "extreme" level required for such disturbance to warrant a finding of the statutory mental health mitigating factor. (*See* [D.E. 117] at 95). The five mitigating factors argued here are not the same four mitigating factors which were clearly delineated for the trial court in the Defendant's Sentencing Memorandum. Rather, Mr. Holland only made veiled references to four[63] of the mitigating factors argued here within the argument section of his memorandum. *See id.* at 104-06. Therefore, the trial court drafted its Sentencing order using the specific non-statutory mitigating circumstances as listed by Mr. Holland in his Sentencing Memorandum and not those mitigating circumstances argued here. (*See* [D.E. 125-

---

[63] Mr. Holland never mentioned that the homicide occurred with little or no premeditation in his argument on non-statutory mitigation anywhere in his Sentencing Memorandum. *See* ([D.E. 125-82] at 103).

84] at 17-21).

This is not to say that the trial court failed to consider the non-statutory mitigating factors that Mr. Holland now asserts were ignored by the trial court.  To the contrary, the trial court considered those factors and they were either rejected or given little weight.

As to Mr. Holland's argument that he had used drugs at the time of the offense, the trial court rejected this argument citing testimony from Dr. Martell who stated that, in his opinion, Mr. Holland was "sober by the time Officer Scott Winters was shot." (*Id.* at 18).  The trial court found that "[a]s a result, based upon the evidence presented, this non-statutory mitigating circumstance had little or no role in the murder of officer Scott Winters." (*Id.*).

The trial court also analyzed the testimony regarding alleged brain damage suffered by Mr. Holland due to a severe beating[64] and found that the defendant's own witnesses "testified that there was no residual organic brain damage." (*Id.* at 19).  Therefore, the trial court concluded that this mitigating circumstance "was not established by a preponderance of the evidence." (*Id.*).

The trial court also considered "the fact that Petitioner may have been suffering from a mental or emotional disturbance less than the extreme level required" to warrant a finding of the statutory mitigating mental health factor and found that Mr. Holland "established the existence" of mental illness. ([D.E. 125-84] at 19).  However, the court gave that circumstance "little weight." ([D.E. 125-84] at 19).

Finally, as to Mr. Holland's assertion that prior to his drug addiction he engaged in

---

[64] The Court acknowledges that this determination is different from a determination that Mr. Holland suffered "traumatic effect[s]" as a result of the beating.  However, it was Mr. Holland, in his Sentencing Memorandum, who styled this argument as "Organic brain damage due to severe beating received while in prison." ([D.E. 125-82] at 103).

positive childhood activities and loving family relationships, the trial court did summarize the testimony from Albert Holland Sr. regarding his son's conduct and activities before his behavior dramatically changed in the eleventh grade. ([D.E. 125-84] at 6). While the court did not specifically include this testimony as a mitigating circumstance in its sentencing order, perhaps because Mr. Holland did not specifically allege this as a mitigating circumstance which the court should consider, the record shows that the trial court did summarize the testimony regarding this circumstance in the section of the Sentencing Order designated for non-statutory mitigating circumstances such that the trial court did consider it. (*See id.* at 6).

Finally, as Mr. Holland did not assert that he was entitled to consideration for non-statutory mitigation because the homicide "occurred with little or no premeditation," the trial court cannot be found to have failed to consider it when it had not been presented to the court in the first instance.[65] *Spaziano v. Singletary*, 36 F.3d 1028, 1032 (11th Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995)("it is almost entirely dependent upon the answer to a question of fact: did the sentencing judge consider any and all nonstatutory mitigating circumstance evidence that was *presented* to him?" )(emphasis added). Accordingly, habeas relief is denied.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Mr. Holland's Amended Petition for Writ of Habeas Corpus [D.E.117] is **GRANTED**, in part, as to Claim One and the remaining claims are

---

[65] This is not to say that the issue of premeditation was not before the trial court. It clearly was, on more than one occasion. However, the trial court rejected, on more than one occasion, Mr. Holland's arguments that the murder of Officer Winters was not premeditated. ([D.E. 125-41] at 101), ([D.E. 125-51] at 53) & ([D.E. 125-59] at 24)).

**DENIED**.  It is the Order of this Court that Albert Holland, should receive a new trial before an untainted jury within ninety (90) days of the date of this Order, unless Respondent files a timely appeal and obtains a stay of this Order. The Clerk of the Court is instructed to **CLOSE** the case.

This case is **CLOSED** and all pending motions are **DENIED** as **MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 30ᵗʰ day of March, 2012.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All counsel of record